January 3, 2025

**Via ECF**

The Honorable James K. Bredar
U.S. District Court for the District of Maryland
101 W. Lombard Street
Baltimore, MD 21201

Re:    *United States v. UnitedHealth Group, Inc.*, No. 1:24-cv-3267, Proposed
         Case Management Order

Dear Judge Bredar:

This joint letter is submitted by the parties in the above-captioned matter. On November 12, 2024, Plaintiffs filed an antitrust action, seeking to block UnitedHealth Group, Inc.'s ("UnitedHealth" or "UHG") proposed acquisition of Amedisys, Inc. ("Amedisys"). *See generally* Compl. (ECF No. 1). Since then—and because of the complexity associated with fast moving antitrust matters—the parties met and conferred multiple times and have worked cooperatively to negotiate a stipulated protective order, which was entered on December 3, 2024 (ECF No. 40), and a proposed case management order ("CMO"), which was filed today.

The proposed CMO is the subject of this letter, which includes both the parties' agreed-upon provisions but also sets out the limited remaining areas of disagreement. For the Court's convenience, the parties have highlighted and bracketed the disputed provisions in the proposed CMO. The parties recognize that the proposed CMO may include more detailed provisions and provide for a more accelerated schedule compared to most civil litigation filed in federal district court; however, the proposed CMO and schedule are consistent with similar case management procedures and schedules for most antitrust merger cases filed by the United States. The parties appreciate the Court's consideration of the parties' proposed timing, recognizing that the proposed schedules do not account for the Court's existing schedule.

The parties are available at the Court's convenience to appear in person or remotely for a status hearing to discuss the proposed CMO, as well as to answer any questions the Court may have about the parties' respective positions.

1. **Paragraph 1: Schedule**

   a.   <u>Plaintiffs' Position on Case Schedule</u>

   ***Plaintiffs propose an aggressive ten month discovery schedule that makes this matter ready for trial in October 2025.***

   Plaintiffs' complaint in this matter seeks to prevent the $3.3 billion merger of two of the largest home health and hospice providers in the United States. Plaintiffs propose an appropriately aggressive schedule that contemplates a trial on the merits in approximately ten months and provides a reasonable amount of time to conduct discovery in this antitrust matter

involving two product markets and three labor markets, hundreds of geographic markets, allegations of improper certification under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act"), and an evolving proposed divestiture of over a hundred home health and hospice assets. Defendants' proposal cuts down by two-and-a-half months the time and opportunity for Plaintiffs to conduct important discovery that will aid this Court in having the most complete factual record possible for trial. Defendants can offer a shorter time schedule because they are in possession and control of their own information, but Plaintiffs need formal discovery to level the playing field for trial. Under Plaintiffs' proposal, the parties have until September 12, 2025, to conclude fact discovery and supplemental fact discovery, including of the divestiture. In addition to providing sufficient time for discovery, Plaintiffs' requested time period also provides sufficient time for the parties to attempt to address any discovery disputes that may arise, or present them to the Court, if necessary.

### Defendants' divestiture agreement is a moving target.

With respect to the proposed divestiture in particular, additional discovery will be necessary because the agreement has already changed since the filing of the complaint and is likely to change again. Initially, Defendants proposed to divest home health and hospice assets to TVG NP Homecare Topco, LP, known as VitalCaring. *See, e.g.,* Compl. ¶¶ 72–73 (describing VitalCaring's inadequacies as a divestiture buyer). Just three weeks after the complaint was filed in this case, the Delaware Chancery Court, following a December 2023 trial, held that VitalCaring's executives committed "egregious breaches of their duty of loyalty" to Encompass—their former employer and a home health and hospice competitor—or aided and abetted those breaches through a variety of means including falsifying records and deleting evidence. *Enhabit, Inc., et al. v. Nautic Partners IX, L.P., et al.,* No. 2022-0837-LWW, 2024 WL 4929729, *24, *44 (Del. Ct. of Chancery Dec. 2, 2024). Because VitalCaring has no profits, the court imposed a constructive trust on it, ensuring that Encompass would receive 43% of VitalCaring's profits "due to the willful misconduct that produced VitalCaring." *Id.* at *30, *41.

Days later, Defendants informed Plaintiffs that they abandoned VitalCaring as a buyer and are soliciting new divestiture buyer(s). Defendants have not yet identified a new divestiture buyer(s). Once those buyer(s) are selected, Plaintiffs must evaluate their sufficiency, analyze the effect of the buyer(s) on the markets at issue, and assess the adequacy of the transition services agreement(s), among other items. Because counsel for Defendants represented that the assets in the divestiture package will likely change now that they have had the opportunity to review the Complaint, Plaintiffs must accordingly analyze any new assets proposed for divestiture. And because Defendants declined to agree to provide information regarding putative bidders, finalists, or assets until to March 31, 2025, Plaintiffs need sufficient time in discovery after that date to probe the materially changed divestiture package(s) and buyer(s), that could not have occurred during the investigation and cannot occur until Defendants disclose such information.

### Plaintiffs proposed schedule includes accelerated expert discovery.

Plaintiffs also request 64 days to conduct expert discovery. In merger challenges the parties often rely on multiple experts, and Plaintiffs anticipate that will be the case here. Typically, parties rely on one or more economic experts to present quantitative analyses addressing issues including market concentration and the change in concentration due to the

merger. *See, e.g.*, 2023 Merger Guidelines, § 2.1. In addition, parties may rely on experts to provide background to the Court on the industries involved in the proposed merger. Plaintiffs' proposed schedule for expert discovery permits sufficient time for the parties to exchange a series of three expert reports for these multiple experts and to take accompanying depositions. Providing this time for the experts to conduct their potentially complex analyses will benefit the Court by providing it with clear, streamlined analyses of the markets and issues in the case.

### *Plaintiffs proposed schedule is consistent with past merger challenges.*

Under the schedule proposed by Plaintiffs, trial will commence on October 27, 2025—less than a year after the complaint was filed, ten months after discovery will begin, and less than six months after Defendants finalize a new divestiture proposal. This time to trial between the beginning of discovery and trial is commensurate with the time to trial in other merger cases filed by the government. *See, e.g., United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1 (D.D.C. 2022) (272 days); *United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) (257 days); *United States v. JetBlue Airways Corp.*, 712 F. Supp. 3d 109 (D. Mass. 2024), *appeal dismissed*, No. 24-1092, 2024 WL 3491184 (1st Cir. Mar. 5, 2024) (239 days).

More time may be warranted in this case than in many other antitrust cases because Defendants' proposed merger is anticompetitive in more product markets and in more geographic areas than were at issue in other cases. Defendants point to the schedule in *United States v. UnitedHealth Group Inc., 630 F. Supp. 3d 118 (D.D.C. 2022) ("United Change"), dismissed,* No. 22-5301, 2023 WL 2717667 (D.C. Cir. Mar. 27, 2023), a case in which the United States challenged UnitedHealth's merger on vertical theories in which local market evidence was not prominent and in one national, horizontal market. Likewise, many of the other cases listed by Defendants below involve significantly narrower issues than this case. For example, *United States v. Booz Allen Hamilton Inc.*, No. CCB-22-1603 (D. Md.) involved one product market and a one-buyer, national geographic market, and *United States v. United States Sugar Corp.*, No. 21-1644 (D. Del.) involved one product market with two nested geographic markets. As well, the cases cited by Defendants began discovery closer in time to service of the complaints, including those with longer time-to-trial dates. *See, e.g., United Change*, No. 22-cv-00481 (D.D.C.) (26 days after complaint filed); *United States v. Assa Abloy AB*, No. 22-cv-01603 (D.D.C.) (29 days after complaint filed); *JetBlue*, No. 1:23-cv-105111 (D. Mass) (10 days after complaint filed).

Here, Plaintiffs bring claims over hundreds of local markets and must assess competitive effects in two product markets and three labor markets over a wide geographic area, in order to present a clear picture to the Court of the transaction's impact on competition. Because each home health and hospice location acts with the local population in mind, responding to local conditions and in accordance with local laws and regulations, *see, e.g.,* Compl. ¶ 22, geographic markets must be assessed separately, necessitating a more intricate evaluation than occurs in cases with one national market. As well, Plaintiffs must collect and present evidence on the impact and purported adequacy of Defendants' new divestiture remedy with new divestiture buyer(s)—which Defendants may continue to modify throughout discovery—in addition to presenting evidence on Defendant Amedisys's HSR Act violation.

***Defendants' proposed schedule provides insufficient time for critical discovery.***

Arguments marshalled by Defendants in favor of their compressed schedule lack merit. First, they contend that the length of the United States' investigation caused uncertainty and hardship, and accordingly discovery should be truncated. A government agency's precomplaint investigation is not a substitute for the post-complaint discovery to which it is entitled under the Federal Rules of Civil Procedure. "'[T]here is no authority which suggests that it is appropriate to limit [an enforcement agency's] right to take discovery based upon the extent of its previous investigation into the facts underlying its case.'" *SEC v. Sargent*, 229 F.3d 68, 80 (1st Cir. 2000) (quoting *SEC v. Saul*, 133 F.R.D. 115, 118 (N.D. Ill. 1990)); *see also SEC v Softpoint Inc.*, 958 F. Supp. 846 (S.D.N.Y. 1997). The United States' objective at the precomplaint stage is focused on whether an enforcement action is warranted, not on proving its case, and thus discovery focused on the parameters of the complaint remains necessary. *See, e.g., Saul*, 133 F.R.D. at 118 ("Whatever inquiries the agency posed in the course of its investigation . . . the contexts are sufficiently different to merit further discovery once the charges have been made and the parties are at issue.").

Defendants incorrectly attribute the timeline in this case to Plaintiffs. Rather, Defendants' actions caused much of the delay, and Plaintiffs should not be prejudiced during litigation as a result. For example, it took Defendants nearly a year after signing the merger agreement to find a divestiture buyer, and then more time yet to finalize divestiture agreements for home health and hospice assets, in June 2024 (for home health) and August 2024 (for hospice). Defendant Amedisys's deficient productions in 2023 required months of time and effort to determine what materials still in existence were missing before Amedisys certified compliance a second time in August 2024. *See* Compl. ¶¶ 78–88. Of the depositions taken (there were 22, including two 30(b)(6) depositions and 16 Defendant witnesses), two had to be re-opened after Amedisys late-produced documents, and two examined Amedisys's production failures. Notably, Defendants refused to agree that pre-complaint depositions could be used for all purposes during trial. Further, it was Defendants—the only parties that can trigger the 30-day period that requires the United States to either close its investigation or file suit—that chose to put the United States on the clock in late 2024, and then to pause proceedings to explore unfruitful settlement attempts.

Since the Complaint was filed, Plaintiffs have diligently worked to reach agreement with Defendants on the CMO and schedule in order to quickly begin discovery. In the midst of those discussions, the Delaware Chancery Court ruled against VitalCaring and its executives, and Defendants elected to terminate their agreement with VitalCaring. Discussions between the parties thus stalled, with Defendants presumably using the time to work on a revised divestiture package and shop it to new buyers—with the benefit of having the Complaint.

Second, the scope of discovery in this case has expanded since the case was filed. As noted above, the recent adverse decision against VitalCaring has already resulted in Defendants seeking different divestiture buyer(s) and modifying the assets proposed to be divested, yet providing no insight into the process, changes to assets, or even number of buyers, prior to the end of March.

Third, Defendants argue that self-imposed deadlines contained within their private merger agreements require a truncated schedule. That argument is without merit. For the entirety

of the investigation through December 26, 2024, the "outside date" for Defendants to complete the merger remained December 27, 2024—changed to December 31, 2025 during CMO negotiations. The merger's outside date was and is entirely under Defendants' control, and if they wish to renegotiate the closing date, they can. *See Publicis Commc'n v. True North Commc'ns*, 132 F.3d 363, 367 (7th Cir. 1997). Likewise, Defendants can negotiate any outside date they would like with any new divestiture buyer(s) that they select.

Finally, although Plaintiffs will undertake every effort to negotiate with Defendants in an effort to avoid discovery disputes, there remains an increased possibility that the Court's assistance may be necessary to resolve any such disputes. As set forth in Count II of Plaintiffs' complaint, Defendant Amedisys provided inadequate productions and information to the United States during the investigation, to the tune of hundreds of thousands of responsive documents, despite certifying that its productions were accurate and complete. *See* Compl. ¶¶ 82–89. While Plaintiffs are hopeful that discovery during litigation will proceed with full transparency, Plaintiffs may require assistance from the Court to resolve or address discovery concerns.

    b.  <u>UHG and Amedisys's position on schedule</u>

Recognizing the Court's busy schedule, UHG and Amedisys respectfully request that trial be held on or about August 2025.  Although such a schedule may be accelerated compared to most cases in this district, the proposed timing is well within the norm for antitrust merger cases and is practically feasible for all parties to this action.

     ***UHG and Amedisys's schedule is significantly longer than most merger cases.***

UHG and Amedisys entered into a merger agreement 18 months ago, on June 26, 2023. The Department of Justice's ("DOJ") extended antitrust review already has created substantial uncertainty and hardship for the merging parties; for their employees—nurses and caregivers who want to know where they will be working; for their shareholders; and for their patients.  The home and hospice patients that UHG and Amedisys serve on a daily basis have been denied the benefits of increased quality of care and efficiencies of treatment that the merger is designed to create. Ultimately, multiple constituencies "have a vested interest in the adjudication of [merger cases]," and a delayed decision on the merger does not benefit any of them.  *United States v. US Airways Grp., Inc.*, 979 F. Supp. 2d 33, 35 (D.D.C. 2013); *see also United States v. Booz Allen Hamilton Inc.*, 2022 WL 9976035, at *13 (D. Md. Oct. 17, 2022) ("The uncertainty caused by this litigation has already delayed the defendants' ability to merge … [and] employees have been left in limbo wondering what the future holds.").

As a result, merger cases like this one are tried on an expedited basis.  Here, Plaintiffs' proposed schedule provides 349 days between the filing of the complaint and the trial date.  This is untenable in light of the delays and hardships already incurred, and further burdens on affected stakeholders (like patients and employees) are unnecessary before the parties try this case on the merits.  Indeed, Plaintiffs' proposal is not "commensurate with the time to trial in other merger cases," as Plaintiffs suggest, and entails a timeline between 77 and 110 days longer than their own baseline merger cases (as shown below).

By contrast, UHG and Amedisys's schedule provides 279 days between the filing of the complaint and the trial date. This schedule is more than feasible. Plaintiffs, through the merger review process, have had more than a year of extensive discovery, and UHG and Amedisys' proposal provides for an additional several months of fact and expert discovery. In fact, UHG and Amedisys's proposed schedule is longer than most merger cases, which typically are brought to trial or a hearing within 6 months of being filed. Below are examples of merger cases that were tried in less time than UHG and Amedisys propose, and substantially less time than Plaintiffs propose.

| Case Name | Complaint Filed | Days to Trial/Hearing |
|---|---|---|
| *United States v. Anthem, Inc.*, No. 1:16-cv-01493-ABJ (D.D.C.) | July 21, 2016 | 123 |
| *United States v. Aetna Inc.*, No. 1:16-cv-01494-JDB (D.D.C.) | July 21, 2016 | 137 |
| *United States v. AT&T Inc.*, No. 1:17-cv-02511-RJL (D.D.C.) | Nov. 20, 2017 | 122 |
| *United States v. Sabre Corp.*, No. 1:19-cv-01548-LPS (D. Del.) | Aug. 20, 2019 | 160 |
| *United States v. U.S. Sugar Corp.*, No. 1:21-cv-01644-MN (D. Del.) | Nov. 23, 2021 | 146 |
| *United States v. UnitedHealth Grp. Inc.*, No. 1:22-cv-00481-CJN (D.D.C.) | Feb. 24, 2022 | 158 |
| *United States v. Booz Allen Hamilton Inc.*, No. 1:22-cv-01603-CCB (D. Md.) | June 29, 2022 | 78 |
| *United States v. Assa Abloy AB*, No. 1:22-cv-02791-ABJ (D.D.C.) | Sept. 15, 2022 | 221 |
| *United States v. JetBlue Airways Corp.*, No. 1:23-cv-10511-WGY (D. Mass.) | Mar. 7, 2023 | 238 |
| *Federal Trade Commission et al v. Kroger Company*, No. 3:24-cv-00347-AN (D. Or.) | Feb. 26, 2024 | 182 |
| *Federal Trade Commission v. Novant Health, Inc.*, No. 5:24-cv-00028-KDB-SCR (W.D.N.C.) | Jan. 25, 2024 | 97 |

***UHG and Amedisys's schedule provides time for ample discovery.***

UHG and Amedisys's proposed schedule is feasible for multiple, independent reasons. For one thing, as noted above, Plaintiffs already have conducted significant pre-complaint discovery. Plaintiffs have received millions of documents from the merging parties and dozens of third parties, deposed 24 witnesses, and received 46 written submissions from UHG, Amedisys, and others regarding the merger. The notion that Plaintiffs need time to create a "level playing field" thus rings hollow in light of the year-plus head start Plaintiffs received in developing the factual basis for their case. Indeed, Plaintiffs are starting this case with more discovery than often is available in civil litigation; they have the benefit of third-party discovery and interviews that UHG and Amedisys do not; and notwithstanding their reference to "hundreds of local markets," their experts already have calculated the market shares, concentration, and volume of commerce in those local markets to the dollar. *See, e.g.*, Compl. ¶¶ 60, 66, 70.

UHG and Amedisys recognize that there will be new divestiture buyers for certain of their assets and agree that Plaintiffs are entitled to take discovery concerning these divestitures. As a result, UHG and Amedisys have committed in their proposed schedule to specific dates that will provide Plaintiffs with adequate time—months, in fact—to assess any new divestiture buyers and any new asset package (which, contrary to Plaintiffs' suggestion, the merging parties do not expect to substantially change) well in advance of an August trial date. UHG and Amedisys have committed to identifying new divestiture buyers by March 31, 2025, and providing Plaintiffs with signed divestiture agreements by May 1, 2025. This will offer Plaintiffs over 90 days of divestiture-specific discovery through the completion of supplemental fact discovery, on top of any third-party discovery Plaintiffs already have taken from potential divestiture buyers.

***Plaintiffs' proposed schedule compounds the harm to the merging parties.***

On the other side of the ledger, and unaddressed by Plaintiffs, is the already significant hardship and uncertainty imposed on UHG and Amedisys, as well as their employees, stakeholders, and patients, caused in part by Plaintiffs' decision not to sue to enjoin the proposed transaction until 505 days after the merger was announced. Those stakeholders should not have to wait in limbo for a day longer than necessary.

In all events, it is critically important to have this case tried and decided by the currently operative "outside date" for the transaction of December 31, 2025. *See* Amedisys, Inc., Entry into a Material Definitive Agreement (Form 8-K) (December 26, 2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000896262/000110465924131813/tm243209 1d1_8k.htm. Plaintiffs' proposal for a trial in late-October 2025 likely will not provide a reasonable amount of time for the parties to try this case and complete post-trial briefing, for the Court to issue a decision, and then for either party to seek an appeal before the outside date of December 31, 2025. The stakes to the merging parties, their employees, their stakeholders, and their patients are too high to accept Plaintiffs' gamble on a late trial date.

**2. Paragraph 5: Completion of the Proposed Transaction**

 a. <u>Plaintiffs' position on timing to complete the proposed transaction</u>
Plaintiffs seek the minimally sufficient time of ten days to determine, if the Court does not find the merger to be anticompetitive, whether to seek emergency relief, including time to obtain necessary approvals to do so.

 Courts have entered similar provisions in other merger case CMOs that provide the United States with 10 days to seek approval for emergency relief or appeal, if needed. *See, e.g., United Change*, No. 22-cv-00481 (D.D.C. Mar. 28, 2022), ECF No. 42 (Scheduling and Case Management Order) ¶ 5; *JetBlue*, No. 23-cv-10511 (D. Mass Apr. 6, 2023), ECF No. 79 (Scheduling and Case Management Order) ¶ 4; *Bertelsmann*, No. 21-cv-2886 (D.D.C. Dec. 15, 2021), ECF No. 53 (Scheduling and Case Management Order) ¶ 19(b). Defendants acknowledge that they require sufficient time to evaluate any necessary appellate court action if the Court finds the merger to be anticompetitive, giving themselves ten *business* days to make such a determination. *See* UnitedHealth 8-K, Dec. 25, 2024 § 1 ("Each of the Parent and the Company hereby unconditionally and irrevocably waives any right to terminate the Merger Agreement pursuant to Section 8.1(b)(i) of the Merger Agreement prior to the earlier of (i) 5:00 p.m. (New York time) on the tenth Business Day following a final Order (whether or not appealable) issued by the U.S. District Court for the District of Maryland . . . ."). Plaintiffs' request for ten days to make the same determination and receive any necessary approvals within the Department of Justice and State Attorney General offices provides parity to the time Defendants gave themselves.

 b. <u>UHG and Amedisys's position on timing to complete the proposed transaction</u>

 UHG and Amedisys object to Plaintiffs' proposal to further delay consummation of the proposed transaction for another 10 days after any ruling in the merging parties' favor. Plaintiffs' proposal is also inconsistent with scheduling orders often entered in antitrust mergers, which do not provide for such relief. Scheduling Order, *United States v. U.S. Sugar Corp, et al.*, No 1:21-cv-01644 (D. Del. Jan. 7, 2022), ECF No. 70; Minute Order, *United States. v. Ab Electrolux*, No. 1:15cv-01039 (D.D.C. July 16, 2015); Case Management Order, *United States v. U.S. Airways Group, Inc.*, et al, No. 1:13cv-01236 (Sept. 9, 2013), ECF No. 71. The provision in *United States v. UnitedHealth Group, Inc.*, Case No. 1:22-cv-0481 (CJN) (D.D.C.), ECF No. 42, does not require a different result: indeed, DOJ's failure in that case to promptly notify the merging parties that they did not intend to appeal or seek emergency relief delayed the transaction unnecessarily.

 Contrary to Plaintiffs' position, 10 days is not the "minimally sufficient time" to determine whether to seek emergency relief. In cases in which government antitrust enforcers (*i.e.*, DOJ or the FTC) have failed to show than a proposed transaction was anticompetitive, requests for emergency relief ordinarily are made within just a few days. *See, e.g., United States v. Sungard Data Sys., Inc.*, Case No. 1:01-cv-02196 (D.D.C.), ECF Nos. 108-09 (temporary injunctive relief pending appeal sought the same day as the district court's decision); *FTC v. Arch Coal, Inc.*, No. 04-5291 (D.C. Cir.) (injunction pending appeal sought the day after the district court's decision), ECF Nos. 97-98; *FTC v. Whole Foods, Inc.*, Case No. 1:07-cv-01021 (D.D.C.), ECF No. 166 (emergency injunction pending appeal sought the day after the district court's decision); *FTC v. Phoebe Putney Health Sys. Inc.*, No. 11-12906EE (11th Cir.), (emergency injunction pending appeal sought 2 days after the district court's decision).

Finally, Plaintiffs misread the parties' extension agreement in suggesting that UHG and Amedisys have given themselves 10 days to make a determination on whether to seek emergency relief. The 10-day buffer provided in the extension agreement is intended to give the parties sufficient time to deal with the logistics of closing (*e.g.*, wiring payment, reviewing satisfaction of closing conditions, etc.). Granting Plaintiffs' request for an additional 10-day delay period after a favorable ruling to the merging parties gives zero buffer room around the extension date, risking the transaction. UHG and Amedisys thus oppose Plaintiffs' proposal to delay the consummation of the transaction for 10 days after any ruling in the merging parties' favor.

### 3. Paragraph 10: Interview Memoranda.

#### a. Plaintiffs' position on interview memoranda

Plaintiffs request that the entirety of the language at paragraph 10 be included with the proposed CMO. During civil merger investigations, the United States routinely asks industry participants and third parties to participate in voluntary interviews, with third parties agreeing to participate in them on the understanding that the information they share will remain confidential. Any notes taken by the United States with respect to these attorney interviews are attorney work product. The United States has included similar language to the above in other case management orders in order to resolve at the outset a recurring issue with respect to improper efforts to seek privileged interview memoranda and the underlying facts within them. *See, e.g., Bertelsmann*, No. 21-cv-2886 (D.D.C. Dec. 15, 2021), ECF No. 53 ¶ 3; *United States v. Anthem, Inc. et al.*, No. 16-1493 (D.D.C. Aug. 31, 2016), ECF No. 91 (Final Case Management Order) ¶ 10; *United States v. Aetna, Inc.*, 16-1494 (D.D.C. Aug. 12, 2016), ECF No. 55 (Scheduling and Case Management Order) ¶ 12.

The work product doctrine protects material "prepared in anticipation of litigation or for trial" by an attorney or an attorney's agent. Fed. R. Civ. P. 26(b)(3)(A); *Hickman v. Taylor*, 329 U.S. 495, 510-514 (1947); *see Judicial Watch, Inc. v. U.S. Dep't of Homeland Security*, 926 F. Supp. 2d 121, 137 (D.D.C. 2013). Questions that an attorney asks an interviewee "necessarily reflect a focus chosen by the lawyer," *In re Vitamins Antitrust Litig.*, 211 F.R.D. 1, 5 (D.D.C. 2002), and are thus work product. Likewise, as with interview memoranda, a lawyer's recollection of a witness interview constitutes opinion work product, which "can be discovered only in very rare and extraordinary circumstances." *Grand Jury Subpoena v. United States*, 870 F.3d 312, 316–17 (4th Cir. 2017) (citing *Hickman; Upjohn Co. v. United States*, 449 U.S. 383 (1981)). The Supreme Court explained in *Hickman*: "[n]o legitimate purpose is served" by "forcing an attorney to repeat or write out all that witnesses have told him." 329 U.S. at 512–13 ("[A]s to oral statements made by witnesses to [an attorney], whether presently in the form of his mental impressions or memoranda, we do not believe that any showing of necessity can be made under the circumstances of this case so as to justify production."); *see also Upjohn*, 449 U.S. at 401 (attorney memoranda are protected work product); *S.E.C. v. NIR Grp., LLC*, 283 F.R.D. 127, 135 (E.D.N.Y. 2012) (protecting law enforcement agency's notes and interview memos because attorney mental impressions "cannot be adequately extricated from the facts").

Defendants cannot make a showing that any circumstances will warrant discovery of attorney work product, considering that they have Plaintiffs' investigative file, which includes correspondence and communications with third parties, and Defendants are free to contact and

interview the third parties interviewed by Plaintiffs. Plaintiffs and Defendants have the same access to the third parties. Defendants should not be permitted to piggy-back on the work done by the United States during the investigation preceding this lawsuit. *United States v. Blue Cross Blue Shield of Michigan,* No. CV 10-14155, 2012 WL 12930840, at *3 (E.D. Mich. May 30, 2012) ("BCBS acknowledges it can get the information it requests in its interrogatories from conducting its own discovery; the Court finds that BCBS's request, therefore, is an attempt to piggy-back on the work done by the United States.").

b.  <u>UHG and Amedisys's position on interview memoranda</u>

UHG and Amedisys object to Plaintiffs' proposed provision, which would result in a blanket waiver by the merging parties of any right to seek purely factual information contained in interview notes or memoranda gathered during Plaintiffs' investigation.  As an initial matter, Plaintiffs' request is premature because discovery has not yet opened, no discovery requests seeking any factual information from interview notes or memoranda have been served, and Plaintiffs have not even attempted to meet and confer about the scope or burden of any hypothetical request.  Instead, Plaintiffs rely on the inaccurate and boilerplate assertion that UHG and Amedisys are trying to freeride on their investigative efforts.

Contrary to Plaintiffs' assertion, their proposal does not comport with the Federal Rules of Civil Procedure or well-established precedent in government antitrust cases, which allows for discovery of facts learned in any interviews during Plaintiffs' investigative process.  *See, e.g.,* *United States v. Dentsply Int'l, Inc.*, 187 F.R.D. 152, 156 (D. Del. 1999) (denying work product protection to facts gathered during DOJ antitrust investigation and noting the government "under the guise of the work product doctrine, seeks to manipulate the timing of the revelation of facts it has gathered and upon which it intends to rely to suit its purposes"); *United States v. Dean Foods Co.*, 2010 WL 3980185, at *2 (E.D. Wis. Oct. 8, 2010) (denying work product protection to facts gathered during DOJ antitrust investigation, noting "Dean seeks only the identities of interviewees and the facts obtained from the interviews that form the basis of the plaintiffs' claims"); *A.R. ex rel. Root v. Dudek*, 151 F. Supp. 3d 1309, 1315 (S.D. Fla. 2015) ("[T]he basic facts that underlie the United States' claims are not protected by the work product doctrine, even though they may have been obtained by the United States' counsel through witness interviews.").  Particularly given the potential scope of third-party discovery in this case, it is inefficient and inequitable to expect UHG and Amedisys to recreate factual interviews that Plaintiffs conducted over the course of a year or more, and to do so in substantially less time.  Plaintiffs' provision thus should be rejected.

**4.  Paragraph 12: Specification of Geographic and Product Markets.**

a.  <u>Plaintiffs' position on geographic market</u>

Defendants' requested provision seeks protected work product and premature expert discovery regarding the scope of the geographic markets alleged by Plaintiffs. Appendices A–C of the Complaint provide ample information on geographic markets, setting forth non-exhaustive lists of Defendants' home health, hospice, and labor locations in markets that, after the proposed merger, would become highly concentrated and in which anticompetitive effects can therefore be presumed. *See* Compl. ¶¶ 60, 65, 70; Appendices A–C.

Geographic markets are a highly contested and extremely important aspect of antitrust cases. Those markets may be subject to change depending on information learned in fact discovery, and information regarding Plaintiffs' market definition prior to being presented by their experts is protected attorney work product. *See, e.g., Fed. Trade Comm'n v. Kroger Co.*, No. 3:24-CV-00347-AN, 2024 WL 2805295, at *2–3 (D. Or. May 31, 2024) (holding that information sought in interrogatories, including "plaintiffs' definition of market competitors" is "protected work product and premature expert discovery"); *United States v. Anthem, Inc.*, No. 1:16-cv-1493 (ABJ), 2016 WL 11755527, at *5 (D.D.C. Sept. 30, 2016) (holding that market share calculations and methodologies used are "the product of legal and economic analyses performed by counsel to the United States and/or their agents in preparation for this litigation.").

In *United States v. Anthem*, for example, the District Court for the District of Columbia rejected the defendant's attempt to gain, during fact discovery, further information on the 20 markets listed in the complaint. *United States v. Anthem, Inc.*, No. 1:16-CV-1493 (ABJ), 2016 WL 11164045, at *1 (D.D.C. Oct. 10, 2016), *report and recommendation adopted*, No. CV 16-1493 (ABJ), 2016 WL 11164029 (D.D.C. Oct. 14, 2016). After the United States provided the sources of its data to defendant—as has already occurred here—the court concluded that defendant's request for "the identities of the markets at issue[] seeks opinion work product because the actual 'presumptively unlawful' markets themselves can only be determined based on [market share and HHI] calculations." *Id.* at *5.

Defendants prematurely seek information that they will receive in expert discovery. The parties have requested and separately proposed schedules for expert discovery, including for Plaintiffs' expert(s) to serve expert reports that will include detailed analyses on geographic markets. Defendants will have a chance to file a responsive report and to depose Plaintiffs' expert(s). Geographic market discovery should be deferred until the experts can opine on those markets—as courts often permit when a party prematurely seeks expert discovery through contention interrogatories. *See, e.g.*, Fed. R. Civ. P. 33(a)(2) ("the court may order that [an] interrogatory need not be answered until designated discovery is complete"); *Par Pharm., Inc. v. TWi Pharm., Inc.*, No. CCB-11-2466, 2012 WL 12548935, at *1 (D. Md. Oct. 4, 2012) ("[I]t is not unusual for courts to order . . . that answers to contention interrogatories may be deferred until the completion of expert discovery to minimize the burden on the responding party.").

Finally, Defendants have shown no actual need for the information they seek. Defendants may provide their experts with the data that Plaintiffs produced with the investigative file, and have their own experts identify geographic markets. *See, e.g., Anthem*, 2016 WL 11164045 at *5. Presumably, Defendants' experts are already analyzing all of Defendants' locations in order to present a revised proposed divestiture package, and it is not incumbent on Plaintiffs to aid in that endeavor.

b.  UHG and Amedisys's position on market information

Plaintiffs do not identify the "hundreds" of geographic markets they allege to be at issue in this case.  *See* Compl. ¶¶ 8-9, 48, 51, 60, 70.  In addition to being "non-exhaustive," which necessarily leaves UHG and Amedisys in the dark about the scope of Plaintiffs' allegations, Plaintiffs' list of locations in which UHG and Amedisys operate does not actually delineate the

scope of the "local markets" at issue, nor whether Plaintiffs' alleged markets are defined in terms of overlapping service areas (and if so, at what threshold). In fact, Plaintiffs' own description of UHG and Amedisys's branches or agencies as being "locations *in* markets" confirms that the information provided does not contain any information about the size of the alleged markets or how they are defined—for example, it is entirely unclear whether the alleged markets are townships, cities, metropolitan areas, intra-state regions, some undefined distance around the parties' facilities, or areas defined in some other way. *See id.* & App'x A-C.

The failure to specify the universe of Plaintiffs' geographic markets is exceptional, and it bears noting just how different this complaint looks from virtually any prior complaint alleging violations of Section 7 of the Clayton Act. Based on UHG and Amedisys's review of over 150 complaints filed between 1992 and 2024, the lack of detail around Plaintiffs' geographic markets here is a clear outlier. *See, e.g.*, Compl. ¶ 30 & App'x, *United States v. Aetna Inc.*, Case No. 1:16-cv-01494 (D.D.C.), ECF No. 1 (alleging as geographic markets "364 counties" listed in an appendix); Compl. ¶¶ 25-27 & App'x, *United States v. Springleaf Holdings, Inc.*, Case No. 1:15-cv-01992 (D.D.C.), ECF No. 1 (alleging as geographic markets "overlapping trade areas" in 126 specific "towns and municipalities" identified in an appendix); Compl. ¶ 33 & App'x A, *United States v. Anheuser-Busch InBev SA/NV*, Case No. 1:13-cv-00127 (D.D.C.), ECF No. 1 (alleging as geographic markets "26 local markets, defined by Metropolitan Statistical Areas" identified in an appendix with combined market share, post-merger HHI, and HHI delta); Compl. ¶¶ 23-24 & App'x B, *United States v. Humana Inc.*, Case No. 1:12-cv-00464 (D.D.C.), ECF No. 1 (alleging geographic markets of "forty-five counties and parishes" identified in an appendix with post-merger share, post-merger HHI, and HHI increase); Second Am. Compl. ¶ 28 & App'x B, *United States v. AT&T Inc.*, Case No. 11-cv-01560 (D.D.C.) (alleging as geographic markets 97 cellular market areas identified in an appendix with post-merger share, post-merger HHI, and HHI increase).[1]

Providing the requested information is a gating issue for key aspects of this case, including the selection of potential bellwether jurisdictions, identification of potential third parties for discovery, selection of branches to be included in the proposed divestiture, and more—all of which will need to take place before Plaintiffs serve their expert reports. Tellingly, Plaintiffs do not deny that they have more specific information about their geographies of concern. Nor could they. Plaintiffs plainly have this information, given the complaint's calculation of the "volume of commerce" in "presumptively unlawful" markets to the dollar—namely, $1.6 billion in the alleged home health product market and $300 million in the alleged hospice product market. *See* Compl. ¶¶ 60, 65-66, 70. The merging parties thus request the disclosure of the specific geographic markets that trigger the "hundreds" of presumptions that were referenced in, but omitted from, the complaint.

---

[1]    To the extent Plaintiffs rely on *United States v. JetBlue Airways Corp.*, Case No. 1:23-cv-10511 (D. Mass.) to suggest otherwise, such reliance is misplaced. There, the plaintiffs alleged as geographic markets "origin-and-destination pairs," which included "all airports in a metropolitan area. *See* First Am. Compl. ¶¶ 65-70, *United States v. JetBlue Airways Corp.*, Case No. 1:23-cv-10511 (D. Mass.), ECF No. 69. This is a bounded universe that is substantially different from Plaintiffs' vague reference to "hundreds" of unspecified local markets of undefined size here.

Plaintiffs' suggestion that discovery should be "deferred" on a "threshold" question that must be adequately pleaded in a complaint gets things exactly backwards. *See Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 493 (4th Cir. 1986) (explaining that pleading "geographic and product" market is a "threshold" requirement). Adequately defining a geographic market is a threshold element of a properly pleaded antitrust case precisely because it is critical to how the parties will gather evidence, present their case, and calculate the denominator for market share analysis. Plaintiffs should not be permitted to conceal their proposed geographic markets until the final innings of this case, and their effort to do so is inconsistent with their effort to obtain early divestiture-related discovery from UHG and Amedisys.

Plaintiffs' cited cases are not to the contrary. As Plaintiffs acknowledge, *United States Anthem*, 2016 WL 11164045 (D.D.C. Oct. 10, 2016), *report and recommendation adopted*, 2016 WL 11164029 (D.D.C. Oct. 14, 2016) involved a discovery request for market information in a bounded universe of 20 out of 25 markets that already had been identified in reasonable detail, not "hundreds" of unspecified "local" markets. *Id.* at *1. *FTC v. Kroger Co.*, 2024 WL 2805295 (D. Or. May 31, 2024) is equally inapposite in that it addressed a discovery request for the "basis" of market share and concentration calculations that the FTC already had provided. That is far removed from Plaintiffs' vague and inadequate allegations here.

In all events, Plaintiffs' proposed geographic markets are not true "work product." The weakness of Plaintiffs' position is "best exposed by [their] necessary concession ... that at some point before trial [they] would have to reveal the facts" about their proposed geographic markets. *See Dentsply*, 187 F.R.D. at 15. If the information Plaintiffs seek to withhold were truly work product, whether attorney or expert, Plaintiffs "would never have" to disclose it. *See id.* Plaintiffs thus "under the guise" of various work product doctrines "seek to manipulate the timing of the revelation of facts it has gathered" with respect to geographic market allegations it has squarely put at issue in the complaint and will need to prove up. Nothing in law or logic allows Plaintiffs to kick the can and delay the timing of their disclosure of critical market information that will inform the entire discovery process in this case.

## 5. Paragraph 18(A): Depositions.

### a. Plaintiffs' position on deposition location

In a transaction valued at $3.3 billion, Defendants should be required to make good faith attempts to make their employees available for deposition in either Maryland, the venue for this matter, or Washington, D.C., where the majority of their counsel are located. Even under the schedule proposed by Plaintiffs, requiring Plaintiffs' counsel to travel to UnitedHealth's headquarters in Minnesota, or to the locations of Defendants' home health and hospice organizations around the country, for every party deposition, will significantly increase the time and expense needed for the parties to conduct depositions. Under the accelerated schedule proposed by Defendants, that travel will impose an even greater burden. Defendants' witnesses are their executives or their experts and are under their control. Defendants' refusal to make good faith efforts to reduce the time spent on travel compounds their efforts to impose a schedule that does not permit a full exploration of the numerous issues to be tried.

13

While there may be instances in which a witness is unable to travel, and Plaintiffs will certainly meet and confer in such situations to reach reasonable accommodations where necessary, asking Defendants to make a good faith effort for a witness to travel to Maryland or to Washington, D.C. does not impose an undue burden nor unilaterally benefit Plaintiffs. Instead, it helps ameliorate the difficulty to the parties of securing necessary deposition testimony under either side's proposed schedule and permits discovery to be completed in a more inexpensive way, in accordance with the principles outlined in Appendix A, Guideline 1 to the Local Rules.

      b.   <u>UHG and Amedisys's position on deposition location</u>

UHG and Amedisys object to Plaintiffs' deposition provision, which is inconsistent with the law and presumptively allocates all deposition travel burdens to the merging parties instead of the antitrust enforcers that filed this lawsuit. Rather, all parties should work to take depositions at a location that is most convenient for the witness being deposed. Depositions of employees and officers of a corporation—and of a corporation itself—generally should be held at the corporation's principal place of business or employee's residence, not where a lawsuit is filed. *See, e.g.*, Wright & Miller, 8A Fed. Prac. & Proc. Civ. § 2112 & n.15 (3d ed.) ("The deposition of a corporation by its agents and officers should ordinarily be taken at its principal place of business."); *McArthur v. Rock Woodfired Pizza & Spirits*, 318 F.R.D. 136, 139 (W.D. Wash. 2016) ("[T]he location of a deposition is determined by the residence or place of business of the deponent, not on the location of the court where the case is pending."); *Botkin v. Donegal Mut. Ins. Co.*, 2011 WL 2447939, at *8 (W.D. Va. June 15, 2011) ("[T]he initial presumption is that a corporate defendant should be deposed in the district of the corporation's principal place of business."); *see also Mid-State Auto., Inc. v. Harco Nat'l Ins. Co.*, 2020 WL 40002, at *4 (S.D. W.Va. Jan. 2, 2020); *Rapoca Energy Co., L.P. v. Amci Export Corp.*, 199 F.R.D. 191, 194 (W.D. Va. 2001). Plaintiffs' proposal is improper, defers to a single group of Plaintiffs' counsel rather than the convenience of up to 60 witnesses, and is insensitive to the concerns of UHG employees who fear for their safety in the aftermath of the New York assassination of one of their colleagues. Plaintiffs—who will have to put up few witnesses for deposition—have no serious basis to argue they are unduly burdened.

Nothing in law or equity sanctions a government-only exception to the civil discovery rules, and Plaintiffs' position here breaks from prior practice in the UHG-Change merger litigation (*United States v. UnitedHealth Group, Inc.*, Case No. 1:22-cv-0481 (CJN) (D.D.C.)), where Plaintiffs traveled to witnesses for depositions. UHG and Amedisys of course will coordinate deposition scheduling in the least burdensome fashion, and with due regard for Plaintiffs' counsel's convenience, but nothing entitles Plaintiffs to an out-of-the-gate inversion of the usual legal standards for deposition scheduling.

**6.   Paragraph 20: Discovery from Executive-Branch Agencies.**

      a.   <u>Plaintiffs' position on discovery from Executive-Branch agencies</u>

There is no need for Defendants to conduct unfettered discovery from executive branch agencies. Although "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense," Fed. R.Civ.P. 26(b)<u>(1)</u>, discovery must be "relevant to the subject matter involved in the action," *id.*, with "all permissible discovery [] measured against

the yardstick of proportionality." *Skinner v. Liller*, No. CV TDC-17-3262, 2023 WL 8520240, at *1 (D. Md. Dec. 8, 2023) (citing *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 523 (D. Md. 2010)).

Defendants have received the investigative materials from Plaintiffs pursuant to the Protective Order, including government-furnished data obtained during the investigation. There is no reason to believe that broad discovery against federal agencies will uncover materials relevant to the defense. In contrast, broad discovery on the executive branch has the potential to impact the smooth functioning of government. *Cf. Kyle v. Fed. Trade Comm'n*, No. 21-MC-9004-SRB, 2021 WL 1407960, at *6 (W.D. Mo. Apr. 14, 2021) (citing *Exxon Shipping Co v. U.S. Dep't of Interior*, 34 F.3d 774, 779 (9th Cir. 1994)) (acknowledging in the context of a third party subpoena to the FTC "the government's serious and legitimate concern that its employee resources not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations."). Accordingly, Defendants should be prohibited up front from engaging in a fishing expedition during discovery. *See R. Ernest Cohn, D.C., D.A.B.C.O. v. Bond*, 953 F.2d 154, 159 (4th Cir. 1991). Further, broad discovery on executive branch agencies has the potential to require time consuming motions practice based on relevance and privilege. If discovery requests were to withstand such efforts, requests to executive branch agencies require significant time for production of documents.

### b. UHG and Amedisys's position on discovery from Executive-Branch agencies

UHG and Amedisys object that Plaintiffs' proposed provision is premature in the absence of any actual discovery requests. Plaintiffs claim "[t]here is no need" "to conduct unfettered discovery from executive branch agencies" therefore is a straw man—UHG and Amedisys have not sought to conduct "unfettered" discovery, and nothing suggests they will do so. Plaintiffs' request instead seems calculated to foreclose *any* discovery from executive branch agencies, simply because Plaintiffs have produced their investigative file. Respectfully, UHG and Amedisys should not have to rely on Plaintiffs' strategic decisions in developing pre-complaint discovery from executive agencies. To give one example, although the parties' review of Plaintiffs' investigative file is ongoing, UHG and Amedisys have no reason to believe that Plaintiffs obtained or produced information from CMS studying the effectiveness of value-based care in the home health and hospice settings.

Plaintiffs are likewise wrong that garden-variety civil discovery "has the potential to impact the smooth functioning of government." Plaintiffs offer no support or detail in support of that contention. In any event, Plaintiffs are not entitled to a discovery carve-out suggesting that they may be entitled to an extension of CMO deadlines not offered to any other party. Executive agency discovery can (and should) be addressed like all other party discovery, in the context of specific requests. Indeed, courts addressing federal agency discovery typically do so in the context of specific requests, not in CMO negotiations.

Finally, to the extent Plaintiffs' proposal suggests that executive branch agencies other than DOJ are not "parties" to this litigation, and that discovery issued to them should be governed by something other than this CMO, Plaintiffs are wrong. Any effort to artificially limit the scope of who constitutes a "party" runs afoul of ample precedent. *See, e.g.*, *United States v. Am. Tel. & Tel. Co.*, 461 F. Supp. 1314, 1330 (D.D.C. 1978) (stating "it simply makes no sense to hold that

the Department of Justice, which essentially is a law office, alone comprises the United States," particularly in the context of a "national in scope" antitrust case involving "broad economic policy" that was likely to implicate "the documents and the activities of a great number of government departments"); *United States v. Atrium Village Assocs.*, 1988 WL 2778, at *1 (N.D. Ill. Jan. 12, 1988) ("[A] fair reading of [*AT&T*] is that it is unrealistic to view the Department of Justice as the sole plaintiff when the United States brings a federal law enforcement action."); *North Dakota v. United States*, 2021 WL 6278456, at *4-6 (D.N.D. Mar. 24, 2021) (noting that "the United States' obligation to respond to discovery requests is not limited to an agency named in the action" and that North Dakota was not foreclosed "from seeking discovery from other federal agencies who possess relevant information" under Rule 34); *Washington v. GEO Grp., Inc.*, 2018 WL 9457998, at *3 (W.D. Wash. Oct. 2, 2018) ("[W]here the plaintiff is the State of Washington, discovery addressed to the State of Washington includes its agencies.  Because the [Attorney General's Office] is the law firm of the State of Washington, [it] should respond to and produce discovery on behalf of the State of Washington, including its agencies."). Plaintiffs' position also is inconsistent with how the term "party" has been defined in similar discovery protocols in government antitrust cases.  *See, e.g.*, *FTC v. Amazon.com, Inc.*, No. 2:23-cv-01495-JHC, Dkt. 160 at § 2.11 (W.D. Wash. Feb. 13, 2024); *Texas v. Google LLC*, No. 4:20-cv-00957-SDJ, Dkt. 101 at 5 (E.D. Tex. Apr. 14, 2021); *United States v. UnitedHealth Grp., Inc.*, No. 1:22-cv-00481 (CJN), Dkt. 28 at 3 (D.D.C. Mar. 9, 2022); *United States v. Visa Inc.*, No. 4:20-cv-07810-JSW, Dkt. 49 at 3 (N.D. Cal. Nov. 25, 2020).

### 7.  Paragraph 31: Timely Production of Evidence Concerning Remedy.

#### a.  Plaintiffs' position regarding timely production of evidence concerning remedy

Knowing that a divestiture was necessary to attempt to remedy the anticompetitive nature of the transaction, Defendants selected and then reached agreement with VitalCaring in June 2024 to divest home health assets, and again in August 2024 to divest additional hospice assets. But, as Plaintiffs demonstrated in the Complaint, Defendants' proposed divestitures are insufficient to remedy the anticompetitive harms from the proposed transaction. Since the Complaint was filed, Defendants have terminated their agreement with VitalCaring, and are now in the process of seeking a new divestiture buyer or buyers in addition to changing the scope of the proposed divested assets. The proposed divestiture is already a moving target and, should Defendants make significant changes to the divesture package or to the purchaser following the close of fact or expert discovery, Plaintiffs will be unduly prejudiced if they are not provided sufficient time to conduct necessary discovery on any proposed divestiture buyer(s) and divestiture package. Defendants' proposed schedule would give Plaintiffs 32 days between Defendants' production of the final divestiture agreement(s) and the close of fact discovery for Plaintiffs to examine what is likely to be an entirely new divestiture package split out between multiple buyers.

To provide this Court with a clear record prior to trial, and to give Plaintiffs a fair opportunity to conduct important discovery on the Defendants' divestiture buyer(s) and agreement(s) as well as avoid undue surprise, Plaintiffs respectfully request protections around the introduction of new evidence regarding the proposed divestiture. Plaintiffs propose that after a date certain (45 days before close of fact discovery), the Court will exclude evidence of any such changes to the divestiture because any probative value would be substantially outweighed by unfair prejudice. Fed. R. Evid. 403. Defendants should be prevented from significantly changing or

modifying their proposed divestiture on the eve of trial. In the alternative, should the Court determine that exclusion of such evidence would be unwarranted, Plaintiffs request a day-for-day addition of time for discovery in order to sufficiently probe changes to the proposed divestiture.

      b.  <u>UHG and Amedisys's position regarding timely production of evidence concerning remedy</u>

UHG and Amedisys object to Plaintiffs' proposed provision, which prematurely seeks a trial-stage remedy at the very beginning of discovery. UHG and Amedisys's proposed schedule requires disclosure of final divestiture asset buyers by March 31, 2025, giving Plaintiffs over 90 days of divestiture-related discovery through the close of fact and supplemental discovery. UHG and Amedisys's proposal likewise requires disclosure of final divestiture agreements on or before May 1, 2025.

This is ample time to complete divestiture-related discovery. Plaintiffs' proposal, in contrast, imposes a blunt exclusion remedy for any divestiture-related evidence not produced 45 days before the close of fact discovery. UHG and Amedisys acknowledge Plaintiffs' need for divestiture discovery, including discovery on changes to any proposed package. But the extent and nature of such discovery, and evaluation of any potential prejudice, will be better addressed in concrete terms if those issues arise, not in the abstract. Plaintiffs provide no support for their position that timely produced discovery (*i.e.*, discovery produced before the close of fact and supplemental discovery) should be presumptively excluded from any trial, and Plaintiffs' position is inconsistent with their own effort to delay discovery into their proposed geographic markets, which necessarily has informed (and will continue to inform) the proposed divestiture package. There is no basis to short-circuit the normal discovery process with a one-sided discovery provision requiring the disclosure of divestiture evidence before Plaintiffs disclose their geographic markets. Plaintiffs cite no prior case providing for their requested remedy, and the Court should not break new ground here.

Sincerely,

<u>/s/ Erin K. Murdock-Park</u>
Erin K. Murdock-Park
*Senior Litigation Counsel*
*U.S. Department of Justice,*
*Antitrust Division*

<u>/s/ Matt Reilly, P.C.</u>
Matt Reilly
*Partner*
*Kirkland & Ellis LLP*
*Counsel for UHG*

<u>/s/ Katherine B. Forrest</u>
Katherine B. Forrest
*Partner*
*Paul, Weiss, Rifkind, Wharton*
*& Garrison LLP*
*Counsel for Amedisys*

Cc:    Counsel of Record