# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>                    *Plaintiffs*,<br><br>v.<br><br>UNITEDHEALTH GROUP<br>INCORPORATED, *et al*,<br><br>                    *Defendants*. | Civil No. 1:24-cv-03267-JKB<br>Judge James K. Bredar |

## PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS
## FROM DEFENDANT AMEDISYS, INC.

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and in accordance with the Case Management Order to be entered by the Court, and as proposed by the parties in their proposed Case Management Order filed at ECF No. 72, Plaintiffs United States of America and the States of Maryland, Illinois, New Jersey, and New York request that Defendant Amedisys, Inc. produce the documents requested below. Any documents the Company produces must be produced in accordance with the terms of any Protective Order in effect in this Lawsuit, and any other applicable court orders in this case regarding confidentiality. Documents shall be produced at the office of the U.S. Department of Justice, Antitrust Division, Healthcare and Consumer Products Section, 450 Fifth Street NW, Suite 4100, Washington, DC 20530, or at any other place counsel for the Plaintiffs may agree.

1

## INSTRUCTIONS

1.      Documents already produced by the Company in the Investigation, including documents produced voluntarily, in response to the Second Request, or in response to any civil investigative demands issued to the Company in the Investigation need not be produced in response to these Requests, unless required to comply with any protocols to this Lawsuit concerning electronically stored information.

2.      Unless otherwise specified, these Requests seek all responsive documents in the Company's possession, custody, or control that were created, modified, sent, or received within three years on the date which these Requests were received.

3.      In addition to the specific instructions set forth below, these Requests incorporate the instructions set forth in any Case Management Order ("CMO") or Protective Order entered in this Lawsuit, as well as Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Rules of the U.S. District Court for the District of Maryland, to the extent those rules are not modified by any Court order. For each responsive document, except for documents for which the Company claims a valid privilege, or that contain any PII or SHI, produce the entire document along with all attachments, enclosures, or "family" members, and all metadata associated with each such document. When a document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material. If a privilege is asserted with regard to part of the material contained in a document, the Company must clearly indicate the portions as to which the privilege is claimed, and the Company must produce the part of the document that the Company does not claim is privileged, along with all "family" members and including all metadata. Each document must be produced in such a fashion, where applicable, to identify the natural person in

whose possession, custody, or control they were found, or the server or central file in which they were found. Produce a legible and usable copy of each document requested together with all non-identical copies and drafts of that document, consistent with the U.S. Department of Justice, Antitrust Division's electronically stored information (ESI) Standard Specifications used in the Investigation and provided with these Requests. Subject to any protocol concerning electronically stored information agreed to by the Defendants or ordered by the Court, all metadata of electronic documents must also be produced. The Company must retain all of the original documents for inspection or copying throughout the pendency of this Lawsuit, any appeal(s), and any related proceedings.

4.     Any responsive document that has been altered, including by the addition of any marginal notes, handwritten notes, underlining, date stamps, received stamps, endorsed or filed stamps, drafts, revisions, or modifications, and other versions of a document is a responsive document in its own right and must be produced.

5.     Subject to the Definitions and Instructions in these Requests, and any protocols concerning electronically stored information ordered by the Court or agreed to by the Defendants, produce hard copy documents and electronically stored information in the form of production set forth by the U.S. Department of Justice, Antitrust Division's ESI Standard Specifications, used in the Investigation and provided with these Requests. Notwithstanding any other Instruction, hard copy documents must be submitted in the same order (organized by sequential document-control numbering) as they were found in the Company's files at the time the documents were collected, and must not be shuffled or otherwise rearranged. For bound hard copy documents— including notebooks, notepads, journals, planners, or other documents bound by staples, binders, or paper clips, or other means—produce all printed pages of the bound hard copy document if

any page or part thereof is responsive. For any responsive text messages, produce the surrounding thread of texts involving the same participants in that 24-hour calendar day and in the same format as produced during the Investigation.

6.      If otherwise identical copies of a document are in the possession, custody, or control of more than one natural person or other document custodian, a copy of that document must be produced from each such natural person or other document custodian. The Company may deduplicate to the extent permitted under and in compliance with the U.S. Department of Justice, Antitrust Division's ESI Standard Specifications, used in the Investigation and provided with these Requests.

7.      If any document is withheld based on an objection to any Request, all other documents responsive to that Request not subject to the objection must be produced.

8.      The specificity of any single Request shall not limit the generality of any other Request.

9.      Where a claim of privilege or other protection from discovery is asserted in objecting to any Request or sub-part thereof, and any document is withheld (in whole or in part) on the basis of such assertion, with the exception of those communications that are exempt under the CMO, the Company shall provide a log ("Privilege Log") in Microsoft Excel format that identifies, for each document:

>       a.      the nature of the privilege or protection from discovery that is being claimed
>               with respect to each document (including identification of whether the
>               document is being withheld entirely or redacted);
>
>       b.      the following non-privileged metadata: all authors, addressees, and
>               recipients of the document (including those copy recipients and blind copy

4

recipients); the subject line (if an email) or the file name (if non-email); date of the document; type of document (*e.g.*, .pdf, Excel, .msg); Bates range; family Bates range, if applicable; and custodian(s). The Company shall also produce a separate index containing an alphabetical list (by last name) of each name on the Privilege Log, identifying titles (for party employees), Company affiliations, the members of any group or email list on the Privilege Log, where practicable (*e.g.*, Board of Directors), and any name variations used in the Privilege Log for the same individual;

c.   a description of each document containing sufficient information to identify the specific subject matter of the document or communication and to enable Plaintiff to assess the applicability of the privilege or protection claimed and the name of the attorney(s) whose work gives rise to the privilege claim; and

d.   the identity of and any production Bates number assigned to any attachment(s), enclosure(s), cover letter(s), or cover email(s) of each document, including the information outlined in subsections above for each such attachment, enclosure, cover letter, or cover email.

Attachments, enclosures, cover letters, and cover emails shall be entered separately on the Privilege Log. The Privilege Log shall include the full name, title, and employer of each author, addressee, and recipient, denoting each attorney acting in a legal capacity with respect to the document with the letters "ESQ," except that identification of the name and the Company affiliation for each non-Defendant Person shall be sufficient identification. The Company shall also identify all Persons working in a legal capacity with respect to the withheld material other than attorneys, *e.g.,* paralegals and legal secretaries, who appear on the Privilege Log. Submit all

non-privileged portions of any responsive document (including non-privileged or redactable attachments, enclosures, cover letters, and cover emails) for which a claim of privilege is asserted, noting where redactions to the document have been made. When responsive, privileged documents attached to responsive, non-privileged documents are withheld from production, insert a placeholder to indicate a document has been withheld from that family.

10.    If the Plaintiffs agree to narrow the scope of any of these Requests to a limited group of custodians, a search of each custodian's files must include a search of the files of their predecessors and successors (if applicable); files maintained by their assistants or under their control; and common or shared databases or data sources maintained by the Company that are accessible by each custodian, their predecessors (and successors, if applicable), or assistants.

11.    If the Company is unable to produce a document that is responsive to a Request not due to a claim of privilege or other legal protection, describe the document, state why it cannot be produced, and, if applicable, state the whereabouts of such document when last in the Company's possession.

12.    If the Company produces data in response to any Request, submit the data in an electronically sortable and searchable format, e.g. Excel or delimited text files, and submit all Data Dictionaries applicable to the data produced. Submit all data in a reasonably usable compilation that will allow the Plaintiffs to access with reasonable efforts the information it contains, in accordance with the U.S. Department of Justice, Antitrust Division's ESI Standard Specifications used in the Investigation and provided with these Requests. Producing a database or data set in its entirety, or in certain formats, often does not satisfy the U.S. Department of Justice, Antitrust Division's ESI Standard Specifications.

13.    Where a Request seeks data relating to a Provider, produce all available data

relating to a Provider's identity, including CCNs, Location Code or Amedisys Location ID (if applicable), NPIs, TINs, physical address, and all parent-level, subsidiary, affiliate information, and descriptive categorizations or classifications created in the ordinary course.

14.     Where a Request seeks data relating to a health insurer (including any payer), produce all available data relating to a health insurer's identity, including TINs, health insurer IDs, contracting entity, and all parent-level, subsidiary, affiliate information, and descriptive categorizations or classifications created in the ordinary course.

15.     These Requests are continuing in nature, and the Company's duty to supplement its production in response to these Requests pursuant to Federal Rule of Civil Procedure 26(e) is ongoing. Plaintiffs reserve the right to seek supplementary responses and the additional supplementary production of documents before trial.

16.     Except as specified in Instruction 1, the fact that a document is in the possession of a Plaintiff, or is produced by another Person, does not relieve the Company of the obligation to produce all of the Company's copies of the same document, even if the Company's copies are identical in all respects to a document produced or held by another Person.

17.     To the extent the Company contends that responsive documents in its possession, custody, or control cannot be produced pursuant to the notice and consent requirements contained in a protective order or agreement, the written response to these Requests for Production must identify the specific provisions of the protective order or agreement on which the Company is relying and the efforts that the Company has undertaken and will undertake to provide notice and obtain consents.

18.     Do not produce any PII or SHI before discussing the information with Plaintiffs. If any document responsive to a particular Request contains PII or SHI that is not responsive to

that Request, redact the unresponsive PII or SHI before producing the document. Provide any index of documents prepared by any Person in connection with the Company's response to these Requests for Production that lists such redacted documents by document control number. If the index is available in electronic form, provide it in that form.

19.     In producing videos or podcasts, for any video or podcast publicly available on the Company's website or published by the Company or its representatives on any other website (including YouTube), the Company may in the alternative submit written permission for the Plaintiffs to download, preserve, and use any such video or podcast through the pendency of this Lawsuit. Should the Company choose this alternative, in the event the Plaintiffs are unable to download and preserve any such video or podcast, the Company agrees to produce a copy of it upon written request.

20.     The present tense includes the past and future tenses. The singular includes the plural, and the plural includes the singular. Words in any gender form (including the masculine, feminine, or neuter) shall include each other gender.

21.     If, in responding to these Requests, the Company encounters any ambiguities when construing a Request, instruction, or definition, the response shall set forth the matter deemed ambiguous and the construction used in responding.

22.     Documents responsive to these Requests shall be delivered to the following addresses:

> For Plaintiff United States of America:
>
> Erin K. Murdock-Park
> Benjamin H. Able
> David M. Stoltzfus
> Giancarlo R. Ambrogio
> Serajul F. Ali
> U.S. Department of Justice

Antitrust Division
450 Fifth Street, NW, Suite 4100
Washington, DC 20530
E-mail: Erin.Murdock-Park@usdoj.gov
E-mail: Benjamin.Able@usdoj.gov
E-mail: David.Stoltzfus@usdoj.gov
E-mail: Giancarlo.Ambrogio@usdoj.gov
E-mail: Serajul.Ali2@usdoj.gov

For Plaintiff State of Maryland:

Schonette J. Walker
Byron Warren
Maryland Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
E-mail: swalker@oag.state.md.us
E-mail: bwarren@oag.state.md.us

For Plaintiff State of Illinois:

Richard S. Schultz
Jennifer Coronel
John Milligan
Office of the Illinois Attorney General
115 S. LaSalle Street, Floor 23
Chicago, IL 60603
E-mail: Richard.Schultz@ilag.gov
Email: Jennifer.Coronel@ilag.gov
Email: John.Milligan@ilag.gov

For Plaintiff State of New Jersey:

Yale A. Leber
Isabella R. Pitt
New Jersey Office of Attorney General
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07102
E-mail: Yale.Leber@law.njoag.gov
E-mail: Isabella.Pitt@law.njoag.gov

For Plaintiff State of New York:

9

Saami Zain
Amy E. McFarlane
Elinor R. Hoffmann
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
E-mail: Saami.Zain@ag.ny.gov
E-mail: Amy.McFarlane@ag.ny.gov
E-mail: Elinor.Hoffmann@ag.ny.gov

## **DEFINITIONS**

The terms defined and used in each of the Requests below should be construed broadly to the fullest extent of their meaning in a good-faith effort to comply with the Federal Rules of Civil Procedure, the Local Rules, the CMO, and the Protective Order, ECF No. 40.

1.      The term "the Company" or "Amedisys" means Amedisys, Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all of their present and former directors, officers, employees, agents (including counsel and document vendors), representatives and any Person acting or purporting to act on their behalf. The terms "parent," "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial (25% or more) or total ownership or control between Amedisys and any other Person.

2.      The terms "UnitedHealth" means UnitedHealth Group Incorporated, its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all of their present and former directors, officers, employees, agents (including counsel), representatives, and any Person acting or purporting to act on their behalf. The terms "parent," "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial (25% or more) or total ownership or control between the UnitedHealth and any other

Person.

3.       The term "LHC Group" OR "LHC" means LHC Group, Inc., its predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing. The terms "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial (25% or more) or total ownership or control between LHC Group and any other Person.

4.       The term "agreement" means any understanding, formal or informal, written or unwritten between two or more Persons.

5.       The terms "and" and "or" have both conjunctive and disjunctive meanings, and shall be construed as necessary to bring within the scope of the discovery Request all responses that might otherwise be construed as being outside of its scope.

6.       The terms "any," "all," "each," and "every" shall be construed as encompassing any and all.

7.       The term "asset" means any business capability, functionality, resource, expertise, or thing of value, including facilities, personnel, information technology systems, intangible assets, management infrastructure, customer relationships, and sales and marketing capabilities.

8.       The term "Aurea" refers to Aurea Software, the provider of email archiving services to Amedisys through the product known as MessageOne and/or Messaging Solutions, and includes Aurea Software's domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all of their present and former directors, officers, employees, agents (including counsel), representatives and any Person acting or purporting to act on their behalf. The terms "parent," "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial (25% or more) or total ownership or control

11

between Aurea and any other Person.

9.      The term "Branch" means each unique Location Code or Amedisys Location ID for each of the Company's locations that provide or are involved with providing any Relevant Service in any Relevant Area.

10.     The term "CCN" means the CMS Certification Number provided by CMS.

11.     The term "clinician" means any natural person that provides medical or clinical care to any patient.

12.     The term "CMS" refers to the Centers for Medicare and Medicaid Services.

13.     The term "communications" means without limitation communications in oral or written form, including electronic communications, e-mails, facsimiles, telephone communications (including text messages), instant messages, memoranda, writings, audio recordings, meetings, interviews, correspondence, exchange of written or recorded information, face-to-face meetings, or any other form of transmission of information. The phrase "communications between" is defined to include instances where one party addresses the other party, but the other party does not necessarily receive the transmission or respond.

14.     The term "Collaborative Work Environment" means a platform used to create, edit, review, approve, store, organize, share, and access documents and information by and among authorized users, potentially in diverse locations and with different devices. Even when based on a common technology platform, Collaborative Work Environments are often configured as separate and closed environments, each one of which is open to a select group of users with layered access control rules (e.g., reader vs. author vs. editor). Collaborative Work Environments include Microsoft SharePoint sites, eRooms, document management systems (e.g., iManage), intranets, web content management systems (e.g., Drupal), wikis, and blogs.

12

15. The term "CON" means the certificate of need laws of any state or locality or any laws that serve an analogous function.

16. The term "Data Dictionary" means documentation of the organization and structure of the databases or data sets that is sufficient to allow their reasonable use by the Plaintiffs, including, for each table of information: (a) the name of the table; (b) a general description of the information contained; (c) the size in both number of records and megabytes; (d) a list of fields; (e) the format, including variable type and length, of each field; (f) a definition for each field as is used by the Company, including the meanings of all codes that can appear as field values; (g) the fields that are primary keys for the purpose of identifying a unique observation; (h) the fields that are foreign keys for the purpose of joining tables; (i) an indication of which fields are populated; and (j) any user guides that explain common use of fields and/or how to generate different reports.

17. The term "discussing" when used to refer to documents means analyzing, constituting, summarizing, reporting on, considering, recommending, setting forth, or describing a subject. Documents that are or contain reports, studies, memoranda, forecasts, analyses, plans, proposals, evaluations, recommendations, directives, procedures, policies, or guidelines regarding a subject should be treated as documents that discuss the subject. However, documents that merely mention or refer to a subject without further elaboration should not be treated as documents that discuss that subject.

18. The term "Divestiture" means any actual or potential divestiture, sale, license, transfer, assignment or other disposition of any assets or businesses of UnitedHealth Group Incorporated or Amedisys, Inc. to any Person in connection with the Transaction.

19. The term "Divestiture Asset" means any Relevant Service, asset, or agreement,

13

and any addition or modification thereto, in connection with the Divestiture.

20.     The term "Divestiture Purchaser" means any entity that considered purchasing any Divestiture Asset, that the Company considered as an actual or potential purchaser of any Divestiture Asset, or that is seeking to purchase any Divestiture Asset.

21.     The term "document" is defined to be synonymous in meaning and equal in scope to the usage of the phrase "documents or electronically stored information" in Rule 34(a)(1)(A) of the Federal Rules of Civil Procedure, and will be interpreted consistently with any Local Rule. For the avoidance of doubt, "document" includes all electronically stored information, including all electronic communications and any attachments thereto (e.g., emails, text messages, and instant messages and all attachments to them), files, audio and/or video recordings, data, and databases. This term includes all metadata associated with each document. A draft or non-identical copy is a separate document within the meaning of this term. This term also includes all writings and hard copy documents. A printout of an email or other electronic document, with or without writing or other markings, is a separate document within the meaning of this term.

22.     The term "home health" has the broadest meaning assigned to it by the Company in (i) the ordinary course of business; (ii) documents attached in response to Items 4(c) and 4(d) of the Company's Notification and Report Form for Certain Mergers and Acquisitions submitted to the U.S. Department of Justice, Antitrust Division, and Federal Trade Commission pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a, in connection with the Transaction; and (iii) the Company's presentations, memoranda, and correspondence with the U.S. Department of Justice, Antitrust Division.

23.     The term "hospice" has the broadest meaning assigned to it by the Company in (i) the ordinary course of business; (ii) documents attached in response to Items 4(c) and 4(d) of the

Company's Notification and Report Form for Certain Mergers and Acquisitions submitted to the U.S. Department of Justice, Antitrust Division, and Federal Trade Commission pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a, in connection with the Transaction; and (iii) the Company's presentations, memoranda, and correspondence with the U.S. Department of Justice, Antitrust Division.

24.     The term "inaccessibility," as it pertains to Amedisys emails, documents, or other data stored on the email archival system provided by Aurea, refers to any email, document or other data being irretrievable for any period of time for any reason whatsoever, including permanent data loss.

25.     The term "including" means "including, but not limited to."

26.     The term "Investigation" means the investigation into the Transaction conducted by the U.S. Department of Justice, Antitrust Division, that preceded the Lawsuit.

27.     The term "Lawsuit" means the lawsuit filed by Plaintiffs against UnitedHealth Group Incorporated and Amedisys, Inc. and pending in the United States District Court for the District of Maryland, Case No. 1:24-cv-03267-JKB.

28.     The term "NPI" refers to National Provider Identifier, as established by CMS.

29.     The term "payer" means any Person that offers, sells, or administers any Relevant Insurance Product.

30.     The term "Person" includes UnitedHealth Group Incorporated and Amedisys, Inc., and means any natural person, corporate entity, partnership, association, joint venture, government entity, trust, or other legal entity. Any reference to a Person that is a business entity includes: that Person's predecessors (including any pre-existing Person that at any time became part of that entity after a merger or acquisition), successors, parents, divisions, subsidiaries,

15

affiliates, each other Person that is directly or indirectly owned or controlled by any of them; each partnership or joint venture to which any of them is a party; all present and former directors, officers, employees, agents, attorneys, consultants, controlling shareholders (and any entity owned by any such controlling shareholder) of any of them; and any other Person acting for or on behalf of any of them.

31.    "Personally Identifiable Information" or "PII" means information or data that would identify an individual, including an individual's Social Security Number; or an individual's name, address, or phone number in combination with one or more of his or her (a) date of birth; (b) driver's license number, or other state or federal government identification number, or a foreign country equivalent identification number; (c) passport number; (d) financial account number; or (e) credit or debit card number.

32.    The term "phone number" means all phone numbers kept in the ordinary course of business and that are associated with a given employee of Amedisys, including work, home, cell, and other.

33.    The term "plans" includes tentative and preliminary proposals, recommendations, or considerations, whether or not finalized or authorized, as well as those that have been adopted.

34.    The term "Provider" means any Person that provides any Relevant Service, including home health and hospice agencies.

35.    The term "Referral Source" means any Person that refers eligible patients to any Provider, and includes the same meaning as the Company affords the term in the ordinary course. For the avoidance of doubt, the term includes the following healthcare entities, including their employed, contracted, and affiliated clinicians: hospitals; skilled nursing facilities; outpatient physician groups and outpatient physicians; assisted living facilities; and senior living

communities.

36.     The term "Reimbursement Rate" refers to any agreed-upon prices or rates for home health services that a payer pays to a Provider participating in any of the payer's Relevant Insurance Product networks, including home health rates paid to a Provider based on (i) clinician type, such as rates for home health services performed by Registered Nurses, Licensed Practical Nurses, physical therapists, occupational therapists, or speech therapists, (ii) patient conditions or groupings of patients, and (iii) any other classifications of care for which reimbursement applies in the ordinary course of business. For avoidance of doubt, the term "Reimbursement Rate" encompasses all forms and structures of home health reimbursement, including per visit, episodic, case rate, bundled, or quality-bonus payments.

37.     The terms "relating to," "relate to," and "relating thereto" mean in whole or in part constituting, containing, concerning, discussing, describing, analyzing, identifying, or stating.

38.     The term "Relevant Area" encompasses, *and for any Request or part thereof calling for the production of data, unless specified otherwise, submit information separately for*, the following geographic regions in which the Company provides or receives any Relevant Service: (a) each individual state in the United States; (b) each individual county within each state; (c) each individual Branch; and (d) any other geographic region for which the Company contracts to provide or receive any Relevant Service in the ordinary course.

39.     The term "Relevant Insurance Product" means each Medicare Advantage plan, including: (i) individual Medicare Advantage Special Needs Plans (SNP); (ii) non-SNP individual Medicare Advantage plans; (iii) group Medicare Advantage plans; and (iv) Medicare Supplement/Medigap plans.

40.     The term "Relevant Service" means home health services and hospice services.

41.     The term "Relevant Worker" means registered nurses working as clinicians in home health, licensed practical and licensed vocational nurses working as clinicians in home health, and registered nurses working as clinicians in hospice.

42.     The term "Request" refers to any request identified within these Requests for Production.

43.     The term "Second Request" means the Request for Additional Information and Documentary Material Issued to Amedisys on August 4, 2023.

44.     The term "senior management" means any board member, Company officer, director, employee at or above the level of vice president, and employee with management responsibility for any business unit or product.

45.     The terms "Sensitive Health Information" or "SHI" mean information or data about an individual's health, including medical records and other individually identifiable health information, whether on paper, in electronic form, or communicated orally. SHI relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

46.     The term "TIN" means Taxpayer Identification Number issued by the Internal Revenue Service.

47.     The term "Transaction" means the proposed transaction between UnitedHealth and Amedisys as described in the Company's premerger notification, HSR 2023-1381.

48.     The term "value-based care" refers to (1) any home health or hospice value-based care arrangements or initiatives as tracked or implemented by the Company in the ordinary

course of business, and (2) any non "per visit" reimbursement arrangement for home health

between the Company and any payer.

## DOCUMENT REQUESTS:

1.     All documents responsive to Specifications 1(a), 4, 8, 10, 32, 33, 34, 35, 42, 44, 50, 55, 58, 60, 62, 64, of the Second Request to the extent such Specifications call for the production of documents. For the avoidance of doubt, this Request does not call for any interrogatory requests included in the above Second Request specifications. Where a term that is defined in a Second Request specification is also defined in these Requests, the definition in these Requests is incorporated by reference into the Second Request Specification and shall apply to this Request.

2.     Data. Without regard to custodian:

     a.     all data since January 1, 2017, underlying the RDFO Scorecard monthly report, for the tables and fields appearing in "10HH RDFO Homecare Scorecard EVP001 by Location and Month 2020 to Nov 2023 - AMEDISYS CONFIDENTIAL.xlsx", and "10HOS RDFO Hospice Scorecard EVP004 by Location and Month 2020 to Jun 2024 with Contract Labor Info -- AMEDISYS CONFIDENTIAL.xlsx", produced in the identical format that the Company produced them during the Investigation;

     b.     all data since January 1, 2017, underlying consolidated income statements by Branch, for the tables and fields appearing in "01CFS AMED Consolidated Income Statement by Location YTD October 2023 - AMEDISYS CONFIDENTIAL.xlsx", produced in the identical format that

the Company produced it during the Investigation;

c.     all referral data since January 1, 2017, for the tables and fields appearing in "2023 Referral Sources Physician and Treatments Aug-2023YTD - AMEDISYS CONFIDENTIAL.xlsx", produced in the identical format that the Company produced it during the Investigation, adding: (i) all home health, palliative, and hospice patients that were referred to Amedisys (including those referrals not taken under care nor admitted by Amedisys), and (ii) the following fields: (1) patient's zip code of residence, (2) patient's county of residence, (3) the full address, Location Code or Amedisys Location ID, and CMS branch identifier, as available, of the Branch to which the patient was referred, if applicable, (4) the identity, CCN, and NPI of the Referral Source, (5) the date on which the referral was received by the Company, (6) the date on which the company accepted or denied the referral, if applicable, (7) the type of service requested by the Referral Source (HCPCS and ICD-10 codes or, if applicable ICD-11 codes), (8) whether the referred patient was accepted or denied, and if denied, any information tracked in the ordinary course about why the referral was denied, (9) any information tracked in the ordinary course about whether a referred patient ultimately received care from a different Provider, and if so, the identity of that Provider;

d.     all data since January 1, 2017, from the Trella Marketscape database for the tables and fields produced during the Investigation, produced in the identical format that the Company produced in files in the "Marketscape -

AMEDISYS CONFIDENTIAL" folder during the Investigation;

e.    for each clinician employed by or contracted with the Company to provide any Relevant Service, including those whose job includes clinical and non-clinical functions, all data since January 1, 2017, relating to employee identifiers and licensing for the tables and fields appearing in "PeopleSoft Labor Follow Up Request – AMEDISYS Confidential.xlsx" produced in the identical format that the Company produced it during the Investigation;

f.    all data since January 1, 2017, relating to the Company's Data Warehouse—from which Amedisys' productions responsive to Specification 3 of the Second Request were previously produced—for the following tables, produced in the identical format that the Company produced the files during the Investigation:

    i.    FactPatientReferral_redacted;

    ii.    for each clinician employed by or contracted with the Company to provide any Relevant Service, including those whose job includes clinical and non-clinical functions, FactPaycheckEarnings_redacted, with the following additional fields: (a) nominal salaries, (b) hourly rates, (c) per-visit rates, (d) mileage reimbursement (per mile), (e) total hours worked, (f) total visits, (g) total productivity points, (h) full- or part-time status, and (i) pay type (e.g., salary, hourly, per-visit, etc.);

    iii.    DimEmployee_redacted, with an additional field indicating employee's year of birth;

    iv.    FactJobFamily_redacted;

    v.    FactJobAction_redacted;

    vi.    DimLocation_redacted; and

    vii.    DimEarningsType_redacted.

For each of the above tables, produce a corresponding Data Dictionary.

g.    for each clinician employed by or contracted with the Company to provide any Relevant Service, including those whose job includes clinical and non-clinical functions, all data since January 1, 2017 (i) relating to employee census information, including all Branches to which the employee is assigned, for the tables and fields appearing in "Spec 13 - PeopleSoft - AMEDISYS CONFIDENTIAL.xlsx", with the following additional fields: (a) employee's phone number, (b) employee's year of birth, (c) employee's zip code and county of residence, and (d) employee's primary Branch (i.e., to the extent a clinician provides care to patients at more than one Branch, provide a field indicating the Branch for which the clinician rendered the most care by patient volume), produced in the identical format that the Company produced it during the Investigation, and (ii) relating to contract workers for the tables and fields appearing in "Spec 13 - Fieldglass - AMEDISYS CONFIDENTIAL.xlsx" produced in the identical format that the Company produced it during the Investigation;

h.    all data since January 1, 2017, separately for each Branch for the tables and fields appearing in "Spec 14 – PeopleSoft – AMEDISYS CONFIDENTIAL.xlsx" and "Amedisys Locations Spec 14 - AMEDISYS

CONFIDENTIAL.xlsx" produced in the identical format that the Company produced them during the Investigation;

i.      all data since January 1, 2014, relating to the Company's Relevant Worker vacancy postings for the tables and fields appearing in the files "Spec 18 – iCIMS – AMEDISYS CONFIDENTIAL.xlsx" and "Spec 18 – Taleo – AMEDISYS CONFIDENTIAL.xlsx" produced in the identical format that the Company produced them during the Investigation;

j.      all data since January 1, 2014, relating to all applicants to Relevant Worker vacancies for the tables and fields appearing in "iCIMS DOJ Full Export data - Redacted with Names.xlsx" and "Taleo Follow Up Request - AMEDISYS CONFIDENTIAL.xlsx" produced in the identical format that the Company produced them during the Investigation, adding:

    i.      for all applicants in the file "Taleo Follow Up Request - AMEDISYS CONFIDENTIAL.xlsx", the following additional fields: (1) applicant's county of residence, (2) applicant's phone number, (3) applicant's year of birth, (4) applicant's previous education, including start and end dates, (5) whether the applicant received an offer (including when the offer wasn't accepted), (6) assigned employee ID for accepted offers, and (7) any forms of compensation in addition to starting salary and sign on bonus, and

    ii.     for all applicants in the file "iCIMS DOJ Full Export data - Redacted with Names.xlsx", the following additional fields: (1) applicant's county of residence, (2) applicant's phone number, (3) applicant's

23

year of birth, (4) applicant's full employment history, (5) whether the applicant received an offer (including when the offer was not accepted), (6) whether the applicant accepted an offer, (7) assigned employee ID for accepted offers, and (8) any forms of compensation in addition to starting salary and sign on bonus;

k.    all data since January 1, 2019, responsive to Specification 12 of the Second Request produced in the identical format that the Company produced it during the Investigation. For purposes of this part of this Request, apply the definitions of the terms Relevant Service and Relevant Area that appear in this Request;

l.    all data since January 1, 2017, for the tables and fields appearing in the file "Spec 20 – AMEDISYS CONFIDENTIAL.xlsx." produced in the identical format that the Company produced it during the Investigation;

m.    all data since January 1, 2017, separately for each home health and hospice Branch, for the tables and fields appearing in the file "Spec 22 - Updated - AMEDISYS CONFIDENTIAL.xlsx" produced in the identical format that the Company produced it during the Investigation;

n.    all data since January 1, 2021, responsive to Specification 21 of the Second Request produced in the identical format that the Company produced these data during the Investigation. For purposes of this part of this Request only: (i) produce data only for Providers providing any Relevant Service, (ii) apply the definitions of Relevant Service and Relevant Area that appear in these Requests, and (iii) for each claim,

provide additional fields reflecting: (1) the full address, Location Code or Amedisys Location ID, CCN, and CMS branch identifier, as available, of the Branch which provided the service associated with the claim, (2) the residential zip code and county for the clinician who performed the service associated with the claim, (3) the type of clinician who performed the service associated with the claim, (4) the patient zip code and county of residence, (5) all clinician and patient identifiers that can be used to link them across observations, excluding any identifiers containing SHI or PII; and

o.     for each clinician employed by or contracted with the Company to provide any Relevant Service, including those whose job includes clinical and non-clinical functions, all data relating to miles travelled by each clinician during the first seven calendar days of every month for the last 12 months for the tables and fields appearing in "HCHB_Amedisys-part-00000.csv", "HCHB_Evolution-part-00000.csv", and "HCHB_TSCH-part-00000.csv" disaggregated to the driving-segment level (i.e., each individual segment travelled between patients, Branches, and the clinician's residence), and expanded to include a brief description of driving segment (e.g., origin and destination), produced in the identical format that the Company produced them during the Investigation. For the avoidance of doubt, segments are discrete driving trips between all the stops clinicians may make throughout a work day. For example, a segment could be from the clinician's residence to their first patient, from the clinician's residence to a Branch

location, or the drive between two consecutive patient visits. For the brief description of the driving segment, provide data reflecting whether the origin and destination are the clinician's residence, a patient, a Branch (including Location Code or Amedisys Location ID), or another location.

3.     All documents relating to the Transaction, including:

a.     documents relating to the planned post-Transaction operational structure of the Company and how the pre-Transaction operational structures of UnitedHealth and Amedisys are intended to be combined to result in that post-Transaction structure, including one copy of each organizational chart or other documents showing or discussing functionally equivalent positions, departments, and other organizational units at UnitedHealth and Amedisys, and employee and senior management actual or planned assignments or roles in the post-Transaction operational structure of UnitedHealth and Amedisys;

b.     documents relating to any formal or informal terms or conditions of the Transaction that are not reflected in the merger or sale agreement between the Defendants;

c.     documents that constitute or reflect communications between UnitedHealth and Amedisys relating to the Transaction before and after the execution of the Agreement and Plan of Merger by and among UnitedHealth Group Incorporated, Aurora Holdings Merger Sub Inc. and Amedisys, Inc. dated as of June 26, 2023, and as amended by the waiver letter dated December 26, 2024;

26

    d.    documents relating to any benefits that may result from the Transaction (including all cost savings, economies, new services, home health or hospice service improvements, software improvements, data collection improvements, data reporting improvements, or other efficiencies or synergies relating to any Relevant Service or any Relevant Worker);

    e.    documents relating to any risk that may result from the Transaction (including all risks related to costs, provision of Relevant Services, or Relevant Workers);

    f.    documents relating to the Transaction's impact on the Company's ability to expand the output or increase the capacity of any Relevant Service;

    g.    documents discussing or reflecting any models or projections estimating the future costs, margins, or reimbursement relating to any Relevant Service;

    h.    documents identifying all Persons responsible for (1) negotiating the Transaction; (2) analyzing the Transaction; (3) recommending that the Transaction be approved; (4) approving the Transaction; and (5) integration planning and implementation for the Transaction; and

    i.    documents relating to the impact of the Transaction on the Company's ability to enter value-based care arrangements with any payer.

4.    Without regard to custodian, a complete set of all documents (including agendas, minutes, presentations, reports, memoranda, recommendations, actions, pre-read materials, or documents that constitute or reflect communications) relating to Amedisys's Board of Director Meetings, including all committees and subcommittees, relating to UnitedHealth, the Transaction, the Divestiture, any Relevant Services, and the hiring and retention of any Relevant

27

Workers.

5.      Without regard to custodian, one copy of any joint-defense and any common interest agreements between the Defendants, or between Defendants and any Divestiture Purchaser, that relate to the Transaction, including the Investigation or the Lawsuit.

6.      Without regard to custodian, one copy of any modification, addendum, or amendment to the Agreement and Plan of Merger by and among UnitedHealth Group Incorporated, Aurora Holdings Merger Sub Inc. and Amedisys, Inc. dated as of June 26, 2023.

7.      Without regard to custodian, one copy of any modification, addendum, or amendment to the Purchase Agreement dated as of June 28, 2024 by and among UnitedHealth Group Incorporated, as Parent, the Other Entities Identified Herein as Sellers and VCG Luna, LLC, as Buyer, except for the First Amendment to Purchase Agreement dated August 21, 2024, including any communication regarding terminating the Purchase Agreement.

8.      Without regard to custodian, one copy of any draft or final agreement related to the Divestiture, as well as any schedules, attachments, and appendices, and any modifications, addenda, or amendments thereto, with any Divestiture Purchaser other than TVG NP Homecare Topco, LP, d/b/a VitalCaring Group.

9.      For any Relevant Area, all documents:

    a.   relating to the Company's home health and hospice quality, including marketing materials, relating to:

        i.   CMS quality ratings (e.g., star ratings), readmissions or hospitalization rates (e.g., acute-care hospitalization rate, emergency department utilization), timely initiation of care (or start-of-care) measures, length of visits (e.g., "length of stay"), clinician travel

times, clinician retention, and any other quality metrics that the
Company tracks in the ordinary course; and

    ii.    how the Defendants compete with each other and with any
Divestiture Purchaser on these metrics;

    b.    relating to the Company's actual and planned investments in improving the
quality metrics responsive to subsection (a) of this Request including any
such actual or planned investments as they relate to competing with the
other Defendant, any Divestiture Purchaser, or any other entity that
provides any Relevant Service; and

    c.    comparing the Company with any home health or hospice competitor on
any of the quality metrics responsive to subsection (a) of this Request.

10.    All documents, including any market studies, forecasts, analyses, and regularly
produced reports that discuss quality surveys or satisfaction surveys, including interviews and
focus groups, taken or conducted by Referral Sources, patients, patients' families, and other
third parties, that relate to any Relevant Service in any Relevant Area, along with any studies
performed by the Company that rely on such surveys.

11.    All documents relating to:

    a.    the publishing of any quality metrics relating to the Company's Relevant
Services on Medicare's public-facing Care Compare website;

    b.    the use of the website by Referral Sources, patients, and patients' families
in any Relevant Area; and

    c.    the Company's efforts to improve its ratings on the Care Compare website.

12.    All documents, including any associated marketing materials or plans, relating

to the Company's use, development, implementation, expansion, or elimination of any specialty programs relating to any Relevant Service (e.g., wound care programs, chronic obstructive pulmonary disease programs, diabetes programs, etc.) or enhanced services relating to any Relevant Service (e.g., ancillary therapies, complementary and integrative health services, veterans' programs, and any other home health or hospice differentiators that the Company invests in or markets in the ordinary course of business) in any Relevant Area, including all documents relating to the decision to develop any such specialty programs or enhanced services, and including documents discussing the development process, the cost of development, the function of the specialty programs or enhanced services, and the benefits of using the programs.

13.    All documents relating to how Referral Sources in any Relevant Area make decisions on which Provider to refer eligible patients, and the Company's analyses, plans or strategies regarding attracting such referrals, including:

      a.    all documents reflecting efforts by the Company's liaisons, account executives, transition coordinators, or other business development or operations staff to attract or admit home health or hospice patients from Referral Sources, including documents reflecting the Company's efforts to compete with LHC or any other competitor for Relevant Services to attract or obtain referrals, and instances where a hospice or home health referral was either tracked or admitted by one Defendant but was ultimately taken under care by the other Defendant;

      b.    all documents relating to any of the Company's initiatives or investments to increase the number of home health and hospice referrals that the

Company receives; and

c.      all documents relating to the Company's marketing of any specialty
programs relating to any Relevant Service (e.g., wound care programs,
chronic obstructive pulmonary disease programs, diabetes programs, etc.)
or enhanced services relating to any Relevant Service (e.g., ancillary
therapies, complementary and integrative health services, veterans'
programs, and any other home health or hospice differentiators that the
Company invests in or markets in the ordinary course of business) to
attract referrals.

14.    All documents, including any studies or analyses, relating to the potential or
actual impact of any of the Company's prior acquisitions of any home health or hospice
company, care center or location on the quality of any Relevant Service provided by any care
center or location involved in the acquisition, including all documents discussing the impact of
the acquisition on the care center or location's CMS quality ratings (e.g., star ratings),
readmissions or hospitalization rates (e.g., acute-care hospitalization rate, emergency
department utilization), timely initiation of care or start-of-care measures, length of visits (e.g.,
"length of stay"), clinician travel times, clinician retention, and any other quality metrics that
the Company tracks in the ordinary course of business.

15.    All documents relating to the development of the Company's palliative care
programs, including documents relating to (i) any internal requests, discussions, or decisions
regarding either starting or developing palliative programs, (ii) financial or other analyses
regarding development of palliative programs, (iii) any geographies where palliative programs
have been developed, (iv) the current status of planning to develop additional palliative

programs, including post-Transaction development, (v) the use of the palliative programs to bolster hospice business or compete with other hospice agencies, and (vi) the parameters of the programs (e.g., parameters regarding patient eligibility, and the scope of care that is provided).

16.    All documents relating to the Company's policies, strategies, or plans implemented by or applied to any care center or groups of care centers offering any Relevant Service in any Relevant Area that relate to all past, and planned or potential future:

    a.    changes in the level of care provided to patients, including time to initiate care, length of visits, visits per episode, number of visits, and on-call coverage that apply to any group of home health and hospice patients served by the care center (or groups of care centers);

    b.    changes to the type of clinician (e.g., registered nurses, licensed practical nurses, licensed vocational nurses) or experience level required of clinicians that the Company uses to provide care during those home health and hospice visits; and

    c.    efforts to change practices to promote the productivity or efficiency of the Company's clinicians, including practices related to clinician driving routes, clinician scheduling, clinician workload, clinician incentives, use of technology, and allocation of administrative tasks.

17.    All documents that discuss or describe the Company's capacity to provide any Relevant Services in any Relevant Area, including documents relating to (i) the measurement of the Company's home health and hospice patient census, staffing ratios, or other applicable metrics of the Company's home health and hospice capacity utilization; (ii) the identification of home health or hospice capacity constraints at any Branch; (iii) any actions taken by the

Company in response to home health or hospice capacity constraints; (iv) any past or future

plans to address such constraints; and (v) the feasibility of increasing capacity (e.g., by adding

or reallocating home health or hospice clinicians), including the costs and time required.

18.     All documents analyzing, comparing, or discussing any relationship between the

size, scope, scale, breadth, depth, or extent of the Company's home health and hospice

operations in any Relevant Area and any of the following:

a.   home health and hospice CMS quality ratings (e.g., star ratings),

readmissions or hospitalization rates (e.g., acute-care hospitalization rate,

emergency department utilization), timely initiation of care or start-of-care

measures, length of visits (e.g., "length of stay"), clinician travel times,

clinician retention, and any other quality metrics that the Company tracks

in the ordinary course of business;

b.   the development or operation of home health and hospice specialty

programs, or other enhanced services;

c.   spreading or managing the Company's costs, including documents

discussing the minimum amount of scale required to operate in any

Relevant Area efficiently;

d.   the Company's ability to negotiate Reimbursement Rates with any payer;

e.   any payments, including bonus payments, that the Company receives from

CMS for providing any Relevant Service to patients covered by traditional

Medicare; and

f.   the Company's ability to enter any business relationships with any Referral

Source (e.g., joint ventures, preferred provider agreements, General in

33

Patient (GIP) contracts and respite care contracts).

19.    For any Relevant Service in any Relevant Area, all documents relating to:

    a.    the identification of any of the Company's competitors, including any Person that has competed or has attempted to compete with the Company, and

    b.    any such  competitor's efforts to compete, including (a) pricing; (b) sales; (c) features or quality (including specialty programs or enhanced service offerings relating to any Relevant Service); (d) acquisition, expansion, or retrenchment plans, (e) plans to construct, modify, change the output of, or close any facility providing any Relevant Service; (f) plans to exit (or actual exit from) the provision of any Relevant Service, (g) discussions of service areas and patient locations, (h) market shares or competitive positions; and (i) relative strengths and weaknesses.

20.    All documents relating to:

    a.    the Company's participation in any payer's Relevant Insurance Product networks for the provision of home health services;

    b.    any comparison between Reimbursement Rates and traditional Medicare rates for home health services;

    c.    the Company's plans or strategies to increase or decrease the number of Relevant Insurance Products for which it is in-network for home health services;

    d.    any plans to increase or decrease the Reimbursement Rates or revenues that the Company receives from any payer, including any such increases or

decreases related to the Transaction; and

  e.    Reimbursement Rate increases or decreases that the Company has
        negotiated with any payer, including all documents relating to the Company
        terminating or threatening to terminate participation with any payer's
        network.

21.    All documents relating to the Company's past and future plans or strategies for
home health value-based care initiatives, including all documents (i) discussing any plans to
enter, exit, increase or decrease the number of home health value-based care arrangements
(e.g., case rate arrangements, episodic arrangements, bundled arrangements, quality-based
bonus arrangements, and any other non-per-visit arrangements, including those that involve
risk) with any payer, (ii) discussing the rationale for entering such arrangements, and (iii)
sufficient to show the terms and conditions of such arrangements.

22.    All documents discussing the impact of CMS's Home Health Value Based
Purchasing Model, as referenced on page 13 of the Defendants' December 15, 2023 white
paper "Home Health Marketplace Dynamics Undermine Any Theory of Anticompetitive
Effects After Proposed Divestiture," on the Company's financial operations and home health
quality in any Relevant Area, including documents discussing the initiative's impact on the
Company's CMS quality ratings (e.g., star ratings), readmissions or hospitalization rates (e.g.,
acute-care hospitalization rate, emergency department utilization), timely initiation of care or
start-of-care measures, length of visits (e.g., "length of stay"), clinician travel times, clinician
retention, and any other quality metrics that the Company tracks in the ordinary course of
business.

23.    All documents analyzing or estimating the costs and margins associated with the

provision of any Relevant Service to enrollees of traditional Medicare or any Relevant Insurance Product in any Relevant Area, including (i) documents discussing or analyzing the costs and margins for any such enrollees covered by per visit, episodic, case rate, bundled, or any non-per visit or risk arrangements, and (ii) documents discussing plans to increase or maintain margins associated with the provision of any Relevant Service to such enrollees.

24.     All documents relating to the geographic areas (e.g., counties, groups of counties, metropolitan statistical areas, core based statistical areas, portions of states, and grouping of states) for which the Company negotiates with any payer to include home health services in any of the payer's Relevant Insurance Product networks.

25.     All documents in which the Company compares its home health or hospice market share to any other home health or hospice industry participants in any Relevant Area, regardless of whether or not the shares computed or estimated constitute a market under the antitrust laws or pursuant to any economic analysis.

26.     All documents relating to training, programming, and directives provided to the Company's home-health and hospice sales personnel (including members of any business development or operations teams) that are related to the marketing or sale of any Relevant Service to any Referral Source in any Relevant Area.

27.     Without regard to custodian, and without regard to date, all documents relating to the assertions, including all documents that do not support the Defendants' assertions, that (a) "[home health and hospice] CONs are routinely bought and sold," (b) "Small players are also critical to MA and commercial plan networks . . . . MA plans could not build a marketable network to meet members' needs without small 'mom-and-pop providers[,]" and (c) "[P]rivate payers tend to contract with as many home health agencies as possible to ensure sufficient

geographic and capacity coverage for their members," located on page 19 of the Defendants'
October 21, 2024 white paper, UnitedHealth's Acquisition of Amedisys Will Benefit Patients
Without Harming Competition For Home Health Or Hospice Care."

28.     All documents relating to the Company's entry, expansion, exit, or reduction
plans in connection with the provision of any Relevant Service, including documents discussing
estimates of costs and time to enter, requirements or steps necessary to enter new markets, and
any entry barriers.

29.     All documents relating to any state or federal regulatory requirements, including
CON laws, that restrict any Provider from providing any Relevant Service including documents
relating to (i) the Company's or its competitors' efforts or plans to obtain a CON for any
Relevant Service directly or through acquisition, (ii) efforts or plans by the Company or its
competitors to maintain, change or expand the coverage of any CON for any Relevant Service,
(iii) the Company or its competitors' likelihood of obtaining approval to receive a CON for any
Relevant Service, and the expected time duration necessary to receive approval, and (iv) the
impact of such regulatory requirements on competition, profits, or costs in the offering of any
Relevant Service.

30.     Without regard to custodian, and without regard to date, all documents
supporting the assertion that "[r]eferral sources make referrals based on a variety of
considerations, including the provider's CMS quality rating, the ease of arranging the patient's
transition, how quickly the home health provider can make contact with and/or see the patient,
and the agency's reputation for service and quality," located on page 14 of Defendants'
October 21, 2024 white paper, "UnitedHealth's Acquisition of Amedisys Will Benefit Patients
Without Harming Competition For Home Health Or Hospice Care."

31.    Without regard to custodian, and without regard to date, all documents relating to post-Transaction planning for any specialty programs or enhanced services relating to any Relevant Service, including any documents supporting the Defendants' claim that "LHC and Amedisys have unique clinical programs that will be extended to the other party's agencies post-closing," located on page 7 of Defendants' October 21, 2024 white paper, "UnitedHealth's Acquisition of Amedisys Will Benefit Patients Without Harming Competition For Home Health Or Hospice Care."

32.    Without regard to custodian, and without regard to date, all documents that support the assertion that "[m]ultiple prior transactions—excellent natural experiments— directly refute the theory of diminished quality resulting from acquisitions where the 2023 HMG thresholds are modestly exceeded in 75% service area markets," located on slide 22 of Defendants' November 7, 2024 presentation to the Department of Justice.

33.    All documents relating to productivity points for any Relevant Worker in any Relevant Area, including policies and guidance, as well as the development, discussion, amendments to, and comparison of policies or guidance to other employers.

34.    All documents relating to the analysis of, or any actions taken by the Company in response to exit data for departing Relevant Workers that the Company has collected or has extracted from third-party platforms, including statistics, interviews, and surveys that capture where departing employees subsequently worked and why they left.

35.    All documents relating to the recruiting channels that each Defendant has targeted to attract Relevant Workers in any Relevant Area (e.g., general job boards, specialty job boards, recruiter outreach, paid lists, social media, email campaigns, employee referrals, alumni recruiting).

36.    All documents relating to any Divestiture Asset, including:

a.    all bids, proposals, letters of intent, diligence requests, term sheets, or draft agreements received from any Divestiture Purchaser, and any response from the Company;

b.    all documents that constitute or reflect communications with (i) United including any consultant, advisor, representative, or other Person acting on United's behalf, (ii) any Divestiture Purchaser including any consultant, advisor, representative, or other Person acting—or appearing to act—on the Divestiture Purchaser's behalf, and (iii) any other third party, including any outside advisor, or consultant;

c.    all materials prepared or used for any meeting with any third party, including any outside advisor, consultant, or Divestiture Purchaser, relating to any Divestiture Asset;

d.    all materials shared with or received from any third party, including any outside advisor, consultant, or Divestiture Purchaser, relating to any Divestiture Asset, including any confidential information memoranda, due diligence reports, term sheets and draft agreements, and any materials contained in any Collaborative Work Environment;

e.    all documents within the Company that discuss or reflect any communications, meetings, negotiations or interactions with any third party, including any outside advisor, consultant, or Divestiture Purchaser, relating to any Divestiture Asset;

     f.     all documents relating to any budget or financial projections for any Divestiture Asset and any valuation of any Divestiture Asset, including any carve-out analyses;

     g.     all documents reflecting the consideration, discussion or evaluation of any Divestiture, Divestiture Asset, or Divestiture Purchaser, including all documents that constitute or reflect communications within the Company and all documents presented, made available, or delivered to the Company's board of directors or comparable body; and

     h.     all documents reflecting the consideration, discussion or evaluation of competition following any Divestiture, including all documents that constitute or reflect communications within the Company.

37.     For any Divestiture or Divestiture Asset, all documents relating to the Company's determination of the scope, content, terms, and valuation of assets to be divested, including:

     a.     the reasons for selecting each home health and hospice agency or Branch that was included;

     b.     all criteria used to select each home health and hospice agency or Branch;

     c.     the parameters or conditions under which the Company marketed assets,

     d.     any valuation methodologies used by the Company, or presented to the Company by any potential purchaser; and

     e.     any changes to the parameters, conditions, criteria, or methodologies.

38.     All documents that constitute or reflect communications with members of the Company's board of directors or comparable body, including communications between

members of the board of directors or comparable body, relating to any Divestiture or Divestiture Asset.

39.    All documents relating to all transitional service agreements or comparable arrangements that the Company will or may provide to any Divestiture Purchaser, the reason or need for any such service, who at the Company will provide such service, and the duration of any such arrangement.

40.    All documents relating to all expected post-sale interactions between the Company and any Divestiture Purchaser not otherwise described in response to Request No. 39 including any supply agreements, transitional services to be provided by the Company to any Divestiture Purchaser, any asset to be shared between the Company and any Divestiture Purchaser, and any ongoing involvement by the Company in any Divestiture Purchaser obtaining any registration, certification, approval, license, or permit relating to any Divestiture Asset.

41.    All documents relating to any discussion, consideration, or evaluation of any additions, modifications, or changes, whether formal or informal, to any actual or proposed agreements with any Divestiture Purchaser, including asset purchase agreement(s), transition services agreement(s), billing services agreement(s), health plan reimbursement contracts (including those relating to Reimbursement Rates); and any schedules, appendices, attachments, or amendments thereto.

42.    All 'Question and Answer' or other materials prepared for any meeting between Amedisys and any Divestiture Purchaser, including materials for any kickoff, confirmatory diligence, integration planning, or other meeting.

43.    All documents that constitute or reflect communications between Aurea and

Amedisys regarding the inaccessibility of Amedisys's emails from the May–June 2023 timeframe in the email archival system provided by Aurea and the efforts to resolve the inaccessibility, including non-privileged documents received or created by Jennifer Guckert Griffin.

44.     All documents internal to Amedisys that discuss the inaccessibility of Amedisys's emails from the May–June 2023 timeframe in the email archival system provided by Aurea and the efforts to resolve the inaccessibility, including non-privileged documents received or created by Jennifer Guckert Griffin.

45.     All documents discussing any target dates by which Amedisys planned to certify compliance with the Second Request, including documents discussing any date in December 2023 as the target date for certification.

46.     Without regard to custodian, all the following data since January 1, 2017, separately for each Branch that provides or has provided any Relevant Service:

a.     the Branch's Location Code or Amedisys Location ID;

b.     the Branch's CCN;

c.     the Branch's CMS branch identifier;

d.     the date when the Company started operating the Branch;

e.     a field indicating whether the Branch was acquired or de-novo built;

f.     if different than the date specified in subpart (d) of this Request, the date when the Company acquired or de-novo built the Branch;

g.     any CCNs that were associated with the Branch before they were acquired or de novo built; and

h.     the date the Branch was closed, sold, or stopped being managed, if

applicable (including identification of whether the Branch was closed, sold, stopped being managed, or ceased operations for any other reasons), and if sold, the identity of the buyer.

47.    Without regard to custodian, all the following data separately for each year since January 1, 2017, separately for each Branch offering any Relevant Service in any Relevant Area, and separately for each patient's (i) residential zip code and (ii) county of residence:

  a. the total number of visits;

  b. the total number of episodes;

  c. the total number of patients;

  d. the total number of visits paid by traditional Medicare;

  e. the total number of episodes paid by traditional Medicare;

  f. the total number of patients with traditional Medicare;

  g. the total traditional Medicare revenue;

  h. the total number of visits paid by Medicare Advantage;

  i. the total number of episodes paid by Medicare Advantage;

  j. the total number of patients with Medicare Advantage; and

  k. the total Medicare Advantage revenue.

48.    Without regard to custodian, for each Relevant Service in each Relevant Area, separately for each month since January 2017, separately according to the patient's county and zip code of residence, separately for each Branch offering home health services owned or operated by the Company, separately for each payer, and separately by HCPCS and ICD-10 codes (or ICD-11 codes if applicable), the following data:

  a. Location Code or Amedisys Location ID;

43

    b.    payer name and internal identification number the Company uses to identify each unique payer; and

    c.    the volume of (1) individual occurrences when a patient receives a treatment for any Relevant Service, (2) visits, and (3) dollars reimbursed by any Relevant Insurance Product relating to each home health service provided by the Company.

49.    Without regard to custodian, all data sufficient to show since January 1, 2017, separately by year, and separately for each Branch offering any Relevant Service in any Relevant Area:

    a.    any specialty programs offered by the Branch in conjunction with a Relevant Service (e.g., Heart Failure, Wound Care, Diabetes, Chronic Obstructive Pulmonary Disease, Veterans Programs, etc.); and

    b.    the number of patient visits and revenue in dollars broken out separately for each specialty program and Branch;

50.    Without regard to custodian, separately for each month since January 2017, and separately for each home health and hospice Branch, all the following data:

    a.    revenues;

    b.    costs of revenue;

    c.    overhead, administrative, and other operating costs;

    d.    investments in infrastructure or equipment;

    e.    average cost per visit, and average cost per visit by visit type;

    f.    any other costs types;

    g.    EBITDA;

h.   depreciation and amortization expense (to the extent not separately broken out as part of other costs);

i.   gross profit;

j.   operating profit;

k.   profit margin, operating margin, and any other Branch-level margins tracked in the ordinary course;

l.   drivers of revenue and costs (e.g., labor, number of patient treatment episodes, average daily census, number of visits, number of visits by clinician type, visit time, and other metrics or variables used in the ordinary course of business); and

m.   to the extent not otherwise produced in response to these Requests, the data underlying the RDFO Scorecard, Variance Income Statement, Expense Analysis, and Consolidated Income Statement monthly financial reports.

For each data field, provide actual results as well as any forecasts, projections, and/or budgeted results for any future periods maintained in the ordinary course of business. For each data field, provide both totals and breakouts at the most granular level the Company maintains in the ordinary course of business. For example, for revenue, break out by payer category (e.g., Medicare Advantage, traditional Medicare, commercial, etc.). For each data field relating to a cost, indicate whether the cost is direct or indirect (allocated); for indirect costs, indicate the source of the allocated cost. Submit documents sufficient to show: (i) definitions for all terms, acronyms, and categories, and

(ii) all changes to methodologies or accounting or definitions over time.

51.    Without regard to custodian all data for each home health and hospice Branch from which the Company was licensed to provide services for each year since January 2017, in the identical format as previously produced in "Geographic Service Area List_Silverlight-07-31-2024.xlsx," in response to the Second Request.

52.    For each Relevant Service, for each year since January 2017, without regard to custodian all data related to CON applications submitted by the Company, including (i) all available information on the project type and characteristics (e.g. a project description, location, budget, timeline) for which the application was submitted, (ii) the application date, (iii) whether the application was accepted or denied, and (iv) the date any acceptance or denial decisions were made.

53.    For each month starting January 2017, and separately for each home health and hospice Branch, without regard to custodian all data underlying the Care Center Capacity Dashboard referenced in AMED-2R-00253101, and any other data the Company maintains in the ordinary course to assess overall and utilized home health and hospice capacity. To the extent applicable, produce documents sufficient to show: (i) definitions for all terms, acronyms, and categories, and (ii) all changes to methodologies or definitions since January 1, 2017.

54.    Without regard to custodian all exit data collected by Amedisys for each category of Relevant Worker for each month since January 2017, and separately for each home health and hospice Branch, including:

     a.    statistics, interviews, and surveys that capture where departing employees subsequently worked and the reason(s) for departure, and

     b.    data that has been extracted from third-party vendors' platforms, such as

IBM.

To the extent applicable, include data relating to the number of individuals surveyed, and produce documents sufficient to show (i) the definitions for all terms, acronyms, and categories; and (ii) the survey methodology and any methodological changes since January 1, 2017.

55.    Without regard to custodian all data reflecting the results of any quality surveys or satisfaction surveys referenced in Request No. 10, including respondent level data, and definitions for all terms, acronyms, and categories, and documents sufficient to understand the survey design.

56.    Without regard to custodian, and without regard to date, all data and code relating to any analyses or assertions in the Defendants' presentation "2024.11.07 - UHG Presentation to Front Office vF.pdf."

57.    Without regard to custodian, and without regard to their date, all data and source code relating to the Defendants' October 21, 2024 White Paper "UnitedHealth's Acquisition of Amedisys Will Benefit Patients Without Harming Competition For Home Health Or Hospice Care" including its Appendix A.

Dated: January 13, 2025

/s/ Erin K. Murdock-Park
Erin K. Murdock-Park
Benjamin H. Able
David M. Stoltzfus
Giancarlo R. Ambrogio
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4100
Washington, DC 20530
Telephone: (202) 549-4551
Fax: (202) 307-5802
E-mail: Giancarlo.Ambrogio@usdoj.gov

*Attorneys for Plaintiff United States of
America*

/s/ Richard S. Schultz
Richard S. Schultz
Jennifer Coronel
John Milligan
Office of the Illinois Attorney General
115 S. LaSalle Street, Floor 23
Chicago, IL 60603
Telephone: (312) 814-3000
E-mail: Richard.Schultz@ilag.gov
E-mail: Jennifer.Coronel@ilag.gov
E-mail: John.Milligan@ilag.gov

*Attorneys for Plaintiff State of Illinois*

/s/ Schonette J. Walker
Schonette J. Walker (USDC Md Bar No.
19490)
Byron Warren (USDC Md Bar No. 30169)
Maryland Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Telephone: (410) 576-6470
E-mail: swalker@oag.state.md.us
E-mail: bwarren@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*

/s/ Yale A. Leber
Yale A. Leber
Isabella R. Pitt
New Jersey Office of Attorney General
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07102
Telephone: (862) 381-4150
E-mail: Yale.Leber@law.njoag.gov
E-mail: Isabella.Pitt@law.njoag.gov

*Attorneys for Plaintiff State of New Jersey*

/s/ Saami Zain
Saami Zain
Amy E. McFarlane
Elinor R. Hoffmann
New York State Office of the Attorney
General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8262
E-mail: Saami.Zain@ag.ny.gov
E-mail: Amy.McFarlane@ag.ny.gov
E-mail: Elinor.Hoffmann@ag.ny.gov

*Attorneys for Plaintiff State of New York*

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2025, I served the foregoing on Defendant's counsel of record as listed in the Joint Proposed Scheduling and Case Management Order filed on January 3, 2025, including by email at the following email addresses:

Katherine B. Forrest, kforrest@paulweiss.com

Geoffrey Chepiga, gchepiga@paulweiss.com

Andrew C. Finch, afinch@paulweiss.com

Joshua H. Soven, jsoven@paulweiss.com

Sara Y. Razi, sara.razi@stblaw.com

Abram J. Ellis, aellis@stblaw.com

N. Preston Miller, preston.miller@stblaw.com

*Counsel for Amedisys, Inc.*

Giancarlo R. Ambrogio
Trial Attorney
Antitrust Division
450 Fifth Street N.W., Suite 4100
Washington, DC 20530
Telephone: (202) 549-4551
Facsimile: (202) 307-5802
E-mail: Giancarlo.ambrogio@usdoj.gov