### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | |
| *Plaintiffs*, | |
| v. | |
| UNITEDHEALTH GROUP INCORPORATED, | Case No. 1:24-cv-03267-JKB |
| and | Judge James K. Bredar |
| AMEDISYS, INC., | |
| *Defendants*. | |

## <u>COMPETITIVE IMPACT STATEMENT</u>

In accordance with the Antitrust Procedures and Penalties Act, 15 U.S.C. §§ 16(b)–(h) (the "APPA" or "Tunney Act"), the United States of America files this Competitive Impact Statement related to the proposed Final Judgment filed in this civil antitrust proceeding.

## I.    NATURE AND PURPOSE OF THE PROCEEDING

On June 26, 2023, UnitedHealth Group Incorporated ("UnitedHealth") agreed to acquire Amedisys, Inc. ("Amedisys") for approximately $3.3 billion. The United States, along with the Attorneys General of Maryland, Illinois, New Jersey, and New York (collectively, the "Plaintiff States"), filed a civil antitrust Complaint on November 12, 2024, seeking to enjoin the proposed acquisition. The Complaint alleges that UnitedHealth's acquisition threatens to substantially lessen competition in local home health, hospice, and nurse labor markets throughout the country in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. In the Complaint, the United States also alleges that Amedisys erroneously and inaccurately certified compliance with its obligations

under Section 7A of the Clayton Act, also known as the Hart-Scott-Rodino Antitrust

Improvements Act of 1976 ("HSR Act"), in violation of the HSR Act, 15 U.S.C. § 18a.

After eight months of intensive litigation, the United States and Plaintiff States reached a

proposed settlement with UnitedHealth and Amedisys. The litigation resulted in a significantly

larger divestiture package than had been previously offered by Defendants as well as new

divestiture buyers more likely to successfully replicate competition in their service areas. With

the benefit of discovery, Plaintiffs concluded that the proposed settlement, embodied in a

proposed Final Judgment and an Asset Preservation and Hold Separate Stipulation and Order

("Stipulation and Order") filed on August 7, 2025 (ECF Nos. 198-1 and 198-2), is designed to

remedy most of the lost competition that would otherwise have resulted from UnitedHealth's

acquisition of Amedisys. The proposed Final Judgment is also designed to remedy Amedisys's

HSR Act violation.

Under the proposed Final Judgment, which is explained more fully below, Defendants are

required to divest 152 home health, 11 hospice, and 1 palliative care locations in local markets in

19 states throughout the country to BrightSpring Health Services, Inc. ("BrightSpring"), The

Pennant Group, Inc. ("Pennant"), or another acquirer acceptable to the United States.

Additionally, under the proposed Final Judgment, Defendant Amedisys is required to (1) pay to

the United States a civil penalty of one million one hundred thousand dollars ($1,100,000) within

thirty days of entry of the proposed Final Judgment and (2) conduct antitrust compliance

training, approved by the Antitrust Division, for certain Amedisys employees, within 365

calendar days of the Court's entry of the Stipulation and Order.

Under the terms of the Stipulation and Order, Defendants must take certain steps to

operate, preserve, and maintain the full economic viability, marketability, and competitiveness of

the assets that must be divested. In addition, management, sales, and operations of the assets that must be divested must be held entirely separate, distinct, and apart from Defendants' other operations. The purpose of these terms in the Stipulation and Order is to ensure that competition is maintained during the pendency of the required divestitures.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment will terminate this action, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II.    DESCRIPTION OF EVENTS GIVING RISE TO THE ALLEGED VIOLATIONS

### A.    The Defendants and the Proposed Transaction

At the time the Complaint was filed, UnitedHealth was the fifth-largest company in the United States. Today, UnitedHealth is the fourth-largest company in the United States, with revenues of more than $400 billion in 2024. It is a vertically integrated corporation, comprising the largest commercial health insurer; the largest employer of physicians; the third-largest pharmacy benefit manager; and one of the largest healthcare technology and service vendors in the United States. This transaction represents UnitedHealth's second major home health and hospice services acquisition in under three years. In February 2023, UnitedHealth acquired LHC Group, Inc. ("LHC"), which is currently the nation's largest home health provider and a large provider of hospice services. Before being acquired by UnitedHealth, LHC collected approximately $2.3 billion in revenue in 2022, making about 12 million visits to patients in 37 states and the District of Columbia that year. Through LHC, UnitedHealth now operates over 530 home health locations and over 120 hospice locations and employs more than 5,000 nurses who provide home health and hospice services.

UnitedHealth's acquisition target, Amedisys, is the second-largest home health provider and third-largest provider of hospice services in the United States. In 2024, Amedisys earned approximately $2.3 billion in revenue and provided more than 10.7 million visits to patients in 38 states and the District of Columbia. Amedisys currently operates over 340 home health locations and over 160 hospice locations and employs more than 3,600 nurses who provide home health and hospice services.

Pursuant to an agreement and plan of merger dated June 26, 2023, as amended, UnitedHealth proposes to acquire Amedisys for approximately $3.3 billion.

### B.    Competitive Effects of This Transaction

#### 1.    Relevant Markets

##### a.    *Home Health Markets*

As alleged in the Complaint, home health services is a relevant service market under Section 7 of the Clayton Act. Home health consists of skilled nursing and therapy services that are provided to millions of Americans each year in the comfort of their homes. Home health patients may need help recovering from recent hospitalizations or managing chronic conditions but are well enough to require only part-time or intermittent care that can be provided at home.

Most patients who receive home health services are seniors enrolled in either traditional Medicare, administered by the Centers for Medicare and Medicaid Services ("CMS"), or privately administered Medicare Advantage plans. Medicare Advantage plans negotiate with home health providers, such as UnitedHealth's LHC subsidiary and Amedisys, for the amounts that a Medicare Advantage plan will reimburse the provider for the home health services it renders to patients insured by that plan. For traditional Medicare enrollees, reimbursement amounts are not negotiated. They are set by CMS. Both CMS and Medicare Advantage plans

prefer that eligible patients use home health services because these services are more cost effective than options for care provided in hospitals, rehabilitation centers, or skilled nursing facilities.

### b.    *Hospice Markets*

As alleged in the Complaint, hospice services provided to Medicare beneficiaries is a relevant service market under Section 7 of the Clayton Act. Each year in the United States, hospice services allow millions of patients, usually seniors, who face terminal conditions to enjoy the last days of their lives primarily in their own homes. Hospice providers and the interdisciplinary teams of doctors, nurses, therapists, aides, chaplains, counselors, and social workers they employ offer a wide range of services to support the physical, psychosocial, spiritual, and emotional needs of terminally ill patients and their family members.

Traditional Medicare covers the vast majority of hospice services in the United States. For hospice providers to be reimbursed by traditional Medicare, their services must satisfy distinct CMS regulations unique to hospice, and CMS tracks individual hospice provider locations on a variety of hospice quality metrics. Under Medicare, patients become eligible for hospice coverage once a doctor certifies that a patient has less than six months left to live, and the patient has chosen to stop any care that aims to cure their underlying disease or illness. This requirement distinguishes hospice from nearly all other healthcare services, which are curative.

### c.    *Home Health and Hospice Nurses*

As alleged in the Complaint, registered nurses ("RNs") working in home health and hospice and licensed practical nurses or licensed vocational nurses ("LPN/LVNs") working in home health are each a relevant labor market. Home health and hospice services rely on skilled nurses to provide effective, high-quality, and personalized care. Home health and hospice nurses

develop close and meaningful relationships with patients, which many nurses find particularly fulfilling. These nurses spend hours in patients' homes providing care and comfort, which can influence patients' recovery and satisfaction with their treatment. Home health and hospice nursing differ from other types of nursing and generally involve fewer and more flexible hours and greater independence. For example, nurses in hospitals work at a fixed location and side-by-side with doctors and other nurses to provide around-the-clock care, while home health and hospice nurses travel to patients' homes and largely work alone. The Complaint also alleges that hospice nurses often particularly feel a specific "calling" to the field.

State licensure laws and both state and Medicare regulations specific to home health and hospice distinguish between RNs and LPN/LVNs. As providers of basic medical care, LPN/LVNs have a smaller scope of duties. In home health, they cannot perform initial assessments of patients or work without supervision. Home health and hospice RNs can perform more advanced clinical duties, including conducting specific types of visits, coordinating care, and supervising other members of a patient's care team, including LPN/LVNs.

### 2.    Geographic Markets

Because home health and hospice services are typically offered to patients in their homes, physicians, hospitals, and other healthcare facilities generally refer patients to home health and hospice agencies that operate in the local area around, and are willing to send their nurses and other caregivers to, a patient's home. State laws and regulations often limit the areas in which home health and hospice providers can offer services. Accordingly, the relevant geographic markets for home health and hospice services are local areas around patient homes. For home health and hospice nurses, their job opportunities are bounded by the time it takes them to travel to the homes of the patients they care for. As a result, the relevant geographic markets for home

health and hospice nurse labor markets are the local areas around these nurses' homes where they can travel to care for patients. The Complaint alleges that hundreds of local home health, hospice, and nursing markets will be affected by UnitedHealth's acquisition of Amedisys.

      **3.**     **Competitive Effects**

As alleged in the Complaint, UnitedHealth's acquisition of Amedisys would increase concentration enough to render the acquisition presumptively anticompetitive in hundreds of local home health markets, local hospice markets, and local home health and hospice nurse labor markets. According to the Complaint, the acquisition would also eliminate substantial competition that occurs directly between UnitedHealth and Amedisys. The loss of this direct or "head-to-head" competition between the Defendants is another reason the acquisition would be anticompetitive.

      **a.**     ***Home Health and Hospice Markets***

Currently, both UnitedHealth and Amedisys compete fiercely against each other to care for home health and hospice patients in numerous local markets. This head-to-head competition takes many forms. For example, each company competes against the other to gain preference with referral sources such as the physicians, hospitals, and other healthcare providers that refer patients to home health and hospice services. The companies further compete against each other with their ability to admit home health and hospice patients quickly. UnitedHealth and Amedisys also compete by offering patients more touchpoints with nurses outside of in-home visits, such as having their staff call patients to follow up, because having those additional touchpoints is valuable to patients. In addition, UnitedHealth and Amedisys compete on their selection of specialty home health and hospice programs offered to patients.

As alleged in the Complaint, in home health and hospice, UnitedHealth and Amedisys compete on a variety of quality dimensions, including delivering better clinical outcomes and lower readmission rates to hospitals and skilled nursing facilities. One key metric that UnitedHealth and Amedisys compete heavily on are CMS "star ratings." CMS "star ratings" are a rating system that CMS publishes online in which the performance of home health and hospice agencies are rated on a scale of one to five stars. The companies constantly compare their quality scores to each other and celebrate when their respective scores increase and their competitor's do not.

In addition, as alleged in the Complaint, home health providers like UnitedHealth and Amedisys compete on price and quality to be in-network with Medicare Advantage plans. Because Medicare Advantage insurers' members pay less for in-network home health services than for out-of-network services, in-network home health providers are likely to attract more members from an insurer than are out-of-network providers. UnitedHealth and Amedisys compete by offering lower rates and better terms to third-party Medicare Advantage insurers for inclusion in insurers' networks.

The acquisition would eliminate the benefits of competition for home health and hospice services between UnitedHealth and Amedisys. The Complaint alleges that non-price dimensions of home health and hospice services, including the quality of the services, would likely either deteriorate or improve more slowly than they would if competition still existed between the two companies. The Complaint further alleges that the proposed acquisition may increase the price of home health services or worsen the terms on which these services are provided for patients covered by Medicare Advantage plans.

### b.    *Home Health and Hospice Nurses*

As alleged in the Complaint, Defendants each employ thousands of home health and hospice nurses and compete intensely to hire and retain them. UnitedHealth and Amedisys try to poach each other's nurses by offering higher pay or better conditions of employment. Their poaching efforts are especially intense following acquisitions, leadership changes, and other major company events. UnitedHealth identified Amedisys as one of its main competitors when reporting on its value proposition for its home health and hospice employees. The two rivals use the other as a comparison when creating competitive benefits offerings. For example, UnitedHealth tracks Amedisys's provision of fleet cars—a highly desirable benefit for some home health and hospice nurses, who travel frequently as part of their job—while Amedisys compares its full suite of benefits, including health insurance, disability insurance, paid leave, and 401(k) matches, to UnitedHealth's. In addition to this enterprise-level competition, there are numerous examples of both companies making competing employment offers to individual nurses and of nurses using these rival offers to improve the terms of their employment.

As the Complaint alleges, UnitedHealth's acquisition of Amedisys may substantially lessen competition for home health and hospice nurses, affecting their employment choices, compensation, and other employment terms.

### 4.    **Difficulty of Entry and Expansion**

Sufficient, timely entry of additional competitors into the relevant home health, hospice, and nurse labor markets is unlikely to prevent the harm to competition that is likely to result from UnitedHealth's acquisition of Amedisys. Expansion among existing competitors is similarly unlikely to occur in a sufficient and timely fashion to prevent harm to patients and nurses. Home health and hospice markets feature high barriers to entry and expansion. Among

other barriers to entry, laws and regulations, such as certificate of need laws, prevent or

significantly delay new entry in many areas. UnitedHealth's strategy of growth by acquiring

other home health and hospice providers reflects the difficulty of entry or expansion in home

health and hospice services.

### C.    Amedisys's Violation of Section 7A

As the Complaint alleges, Amedisys violated Section 7A of the Clayton Act, 15 U.S.C.

§ 18a, by providing to the United States an erroneous and inaccurate certification related to its

production of documents and information during the Antitrust Division's investigation into this

acquisition.

As part of its investigation of this acquisition, on August 4, 2023, the Antitrust Division

required Amedisys to produce "additional information or documentary material relevant to the

proposed acquisition" under Section 18a(e)(1)(A) of the Clayton Act, which is known as a

"Second Request." The Second Request included detailed instructions for compliance. Amedisys

was required to provide the Antitrust Division with "all the information and documentary

material" responsive to the Second Request; if all materials were not provided, Amedisys was

required to also include "a statement of the reasons for such noncompliance." 15 U.S.C.

§§ 18a(e)(2)(A), 18a(e)(2)(B); 16 C.F.R. §§ 801–803.

Amedisys first certified to the United States that it had complied with the Second Request

on December 18, 2023, attesting that the information provided by Amedisys was "true, correct,

and complete in accordance with the statute and rules."[1] Amedisys did not submit a statement of

reasons for non-compliance, indicate that it had chosen not to produce relevant materials in its

---

[1] 16 C.F.R. § 803.6(a)(2), (b); Notification and Report Form, appendix to 16 C.F.R. pt. 803; *see* 15 U.S.C. §§ 18a(b)(1)(B), (e)(2)(b). Amedisys submitted its first certification of compliance with the Second Request on December 18, 2023.

possession, or explain that certain relevant materials were no longer retrievable.[2] Prior to its December 18, 2023 certification of compliance, Amedisys failed to produce large swaths of emails, texts, and hard copy documents:

*Emails:* Amedisys first became aware of a potential problem with its email archiving system in summer 2023. This problem persisted for a period between May and June 2023 that coincided with UnitedHealth and Amedisys's merger negotiations. By October 2023, Amedisys understood that it could not locate these archived emails, and, as of December 18, 2023, the issue remained unresolved.

*Text messages*: Without informing the Antitrust Division, Amedisys unilaterally determined that it did not need to collect or produce text messages for over half of its custodians prior to its December 18, 2023 certification.

*Hard copy documents:* Amedisys also knew of, but failed to produce, any hard copy documents from any custodian prior to its December 18, 2023 certification (despite its former CEO and current Chairman of the Board touting his work-related notetaking in a book published immediately before Defendants announced this proposed acquisition).

Despite the significant known issues described above, Amedisys still certified compliance on December 18, 2023. Amedisys did not acknowledge any of these deficiencies until months later, when the Antitrust Division discovered and presented evidence of them to Amedisys. Even then, Amedisys continued to delay producing relevant documents and refused

---

[2] "A complete response shall be supplied to each item on the Notification and Report Form and to any request for additional information pursuant to section 7A(e) and § 803.20. Whenever the person filing notification is unable to supply a complete response, that person shall provide, for each item for which less than a complete response has been supplied, a statement of reasons for noncompliance." 16 C.F.R. § 803.3.

for months to make the individual who certified compliance with the Second Request available for examination.

After Amedisys submitted its erroneous and inaccurate December 18, 2023 certification, Amedisys produced more than 2.5 million additional relevant documents—substantially more than it had produced in its original production—to complete its Second Request response, including hundreds of thousands of emails, hard copy documents, and text messages that predated its December 18, 2023 certification. These subsequent productions more than doubled Amedisys's pre-December 18, 2023 productions and included materials clearly relevant to the potential impact of this acquisition on competition in the markets for home health and hospice services and for nurses' labor.

More than eight months after its initial certification, on August 26, 2024, Amedisys submitted a second certification in accordance with 16 C.F.R. § 803.6 attesting compliance with its Second Request.

## III.    EXPLANATION OF THE PROPOSED FINAL JUDGMENT

### A.    Divestitures

The relief required by the proposed Final Judgment is designed to remedy the loss of competition alleged in the Complaint in many local markets for home health services, hospice services, and home health and hospice nursing by establishing in those markets at least two independent and economically viable competitors. Paragraph IV.A of the proposed Final Judgment requires Defendants, within seventy-five (75) calendar days after the Court's entry of the Stipulation and Order in this matter or within sixty (60) calendar days of receipt of all necessary Merger Clearances, to divest all offices and contracts related to the 152 home health, 11 hospice, and 1 palliative care branches and agencies identified in the Divestiture Schedules

attached to the proposed Final Judgment, as well as the interests in all joint ventures associated with those branches and agencies, to BrightSpring, Pennant, or an alternative buyer acceptable to the United States, in its sole discretion. The assets must be divested in such a way as to satisfy the United States, in its sole discretion, that the assets can and will be operated by the acquirer as a viable, ongoing business that can compete effectively in these local markets for home health services, hospice services, and home health and hospice nursing. Defendants must take all reasonable steps necessary to accomplish the divestitures quickly and must cooperate with the acquirer.

### 1.    Divestiture Assets

Paragraph IV.A of the proposed Final Judgment requires Defendants to divest all offices and contracts related to the 152 home health, 11 hospice, and 1 palliative care branches and agencies identified in the Divestiture Schedules attached to the proposed Final Judgment. The home health agencies and branches being divested provide care in 18 states, while the hospice agencies being divested provide care in 4 states, and the palliative care location serves patients in Tennessee. The divestitures will be made to BrightSpring, Pennant, and/or to another acquirer acceptable to the United States, in its sole discretion after consultation with any affected Plaintiff State.

Six of the home health locations that Paragraph IV.A of the proposed Final Judgment requires Defendants to divest share licenses or certifications and CMS identification numbers with home health locations that Defendants will retain after the acquisition. Paragraph IV.B of the proposed Final Judgment requires Defendants to divest up to 8 additional home health locations if the acquirers of the 6 "sharing" divested locations receive a final written determination that they are (a) not able to obtain the necessary regulatory approvals to maintain

the home health operations of the divested locations as they existed as of July 17, 2025 or (b) not permitted to bill CMS for the treatment of Medicare or Medicaid patients. In addition, Defendants must divest these additional 8 home health locations if the necessary regulatory approvals for the associated "sharing" divested location have not been obtained within 18 months after the entry of the Stipulation and Order in this matter, unless the United States determines, in its sole discretion, that Defendants are using best efforts to obtain the necessary regulatory approvals and are likely to succeed if provided with additional time.

### 2.    Relevant Personnel

The proposed Final Judgment contains provisions intended to facilitate the acquirer's efforts to hire certain employees. The proposed Final Judgment requires that the Divestiture Assets include the employment contracts for more than 1,800 "Relevant Personnel," i.e., full-time, part-time, or contract employees (including nurses, other healthcare professionals, and business development and account executives) of the Defendants, wherever located, whose work supports the operation of the Divestiture Assets, i.e., the divested home health, hospice, and palliative care agencies and branches described above. Among other requirements, Defendants must waive all non-compete and non-disclosure agreements, vest all unvested pension and other equity rights, provide any pay pro rata, provide all compensation and benefits that those employees have fully or partially accrued, and provide all other benefits that the employees would generally be provided had those employees continued employment with Defendants, including, but not limited to, any retention bonuses or payments. The United States retains sole discretion to resolve any disagreement relating to which employees are Relevant Personnel.

### 3.      Transition Services Agreements

The proposed Final Judgment requires Defendants to provide certain transition services to maintain the viability and competitiveness of the divestiture assets during the transition to the acquirers. Paragraph IV.Q of the proposed Final Judgment requires Defendants, at an acquirer's option, to enter into a transition services agreement for services related to related to human resources, employee health and safety, information technology services and support, clinical service delivery, clinical operations support, real estate, finance, accounting and tax, expense processing, cost reporting, legal, risk, and compliance, revenue cycle management, sales, and billing services for a period of up to 365 calendar days on terms and conditions reasonably related to market conditions for the provision of the transition services. An acquirer may terminate the transition services agreement, or any portion of it, without cost or penalty at any time upon 30 days' notice. The paragraph further provides that the United States, in its sole discretion, may approve one or more extensions of a transition services agreement for a total of up to an additional 180 calendar days and that any amendments to or modifications of any provisions of a transition services agreement are subject to approval by the United States in its sole discretion.

### 4.      Firewalls

The proposed Final Judgment requires that Defendants implement and maintain effective procedures to prevent divestiture acquirers' competitively sensitive information from being shared or disclosed by Defendants' employees working to effectuate the divestitures to Defendants' employees engaged in competing with BrightSpring, Pennant, or other acquirers. These obligations extend at least until an acquirer's competitively sensitive information is no longer readily accessible to Defendants' employees in the ordinary course of business.

### 5.      Divestiture Trustee

If Defendants do not accomplish the divestitures within the period prescribed in Paragraph IV.A, or, if applicable, Paragraph IV.B of the proposed Final Judgment, Section V of the proposed Final Judgment provides that the Court will appoint a divestiture trustee selected by the United States to effect the divestiture. If a divestiture trustee is appointed, the proposed Final Judgment provides that Defendants must pay all costs and expenses of the trustee. The divestiture trustee's commission must be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestiture is accomplished. After the divestiture trustee's appointment becomes effective, the trustee must provide monthly reports to the United States setting forth his or her efforts to accomplish the divestiture. If the divestiture has not been accomplished within 180 calendar days of the divestiture trustee's appointment, the United States may make recommendations to the Court, which will enter such orders as appropriate, in order to carry out the purpose of the Final Judgment, including by extending the term of the divestiture trustee's appointment.

### 6.      Monitor

The proposed Final Judgment provides that the United States may select a monitoring trustee to be recommended to and appointed by the Court. The monitor will have the power and authority to investigate and report on Defendants' compliance with the terms of the proposed Final Judgment and the Stipulation and Order, including (i) whether the divestitures have been effected as required under the proposed Final Judgment; (ii) Defendants' efforts to migrate the data related to the divested assets contained in the electronic medical record, billing, financial, or employee management system from Defendants' systems to the systems of BrightSpring, Pennant, or another acquirer, and (iii) whether Defendants have complied with their obligations

related to Relevant Personnel and transition services, among other obligations (*e.g.*, Paragraphs IV.C-F and IV.K-Q of the proposed Final Judgment). The monitoring trustee will not have any responsibility or obligation for the operation of the Divestiture Assets or Defendants' businesses. The monitoring trustee will serve at Defendants' expense, on such terms and conditions as the United States approves, and Defendants must assist the monitoring trustee in fulfilling his or her obligations. The monitoring trustee will provide periodic reports to the United States and will serve until 90 calendar days after the completion of all Regulatory Approvals related to divestitures, or the divestiture of any additional assets.

### B.    Amedisys's 7A Violation

#### 1.    Civil Penalty

A company's failure to comply with the HSR Act makes it liable to the United States for a civil penalty for each day it is in violation. 15 U.S.C. § 18a(g). The maximum amount of civil penalty during the period relevant to this Complaint was $51,744 per day.[3] The Complaint alleges that Amedisys violated the requirements of the HSR Act each day beginning on December 18, 2023, when it submitted its erroneous and inaccurate certification, until it submitted a second certification attesting that it had submitted a complete response to its Second Request on August 26, 2024. The United States has accepted $1.1 million—less than the maximum penalty permitted under the HSR Act—as an appropriate civil penalty for settlement purposes for this matter only. The penalty here is appropriate because Amedisys agreed to take corrective action internally and because it is willing to resolve the matter by the proposed Final Judgment, thereby avoiding the risks and costs associated with litigation.

---

[3] Federal Civil Penalties Inflation Adjustment Improvements Act of 2015, Pub. L. No. 114-74 § 701, 129 Stat. 599–600 (further amending the Federal Civil Penalties Inflation Adjustment Act of 1990); Rule 1.98, 16 C.F.R. § 1.98, 89 Fed. Reg. 1,445 (Jan. 10, 2024).

### 2.    Corrective Action

As satisfaction for the United States' claim under Section 7A (15 U.S.C. § 18a) against Amedisys, within 30 days of the Court's entry of the Final Judgment, Amedisys must pay to the United States a civil penalty in the amount of $1.1 million. In addition, Paragraph XIV.A of the proposed Final Judgment requires that Amedisys, within 365 calendar days of the Court's entry of the Stipulation and Order, conduct antitrust compliance training, the form and content of which must be approved by the United States in its sole discretion, for (i) Amedisys's corporate leadership and their direct reports, and (ii) certain of Amedisys's field leadership for all lines of business. Within 370 calendar days of entry of the Court's entry of the Stipulation and Order, UnitedHealth's Chief Legal Officer must submit an affidavit certifying compliance with this training requirement.

### C.    Other Provisions to Ensure Compliance

The proposed Final Judgment also contains provisions designed to promote compliance with and make enforcement of the Final Judgment as effective as possible. Paragraph XVII.A of the proposed Final Judgment provides that the United States retains and reserves all rights to enforce the Final Judgment, including the right to seek an order of contempt from the Court. Under the terms of this paragraph, Defendants have agreed that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of the Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence and that Defendants have waived any argument that a different standard of proof should apply. This provision aligns the standard for compliance with the Final Judgment with the standard of proof that applies to the underlying offense that the Final Judgment addresses.

18

Paragraph XVII.B provides additional clarification regarding the interpretation of the provisions of the proposed Final Judgment. The proposed Final Judgment should be interpreted to give full effect to the procompetitive purposes of Sections 7 and 7A of the Clayton Act. Defendants agree that they will abide by the proposed Final Judgment and that they may be held in contempt of the Court for failing to comply with any provision of the proposed Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of this procompetitive purpose.

Paragraph XVII.C provides that, if the Court finds in an enforcement proceeding that a Defendant has violated the Final Judgment, the United States may apply to the Court for an extension of the Final Judgment, together with such other relief as may be appropriate. In addition, to compensate American taxpayers for any costs associated with investigating and enforcing violations of the Final Judgment, Paragraph XVII.C provides that, in any successful effort by the United States to enforce the Final Judgment against a Defendant, whether litigated or resolved before litigation, the Defendant must reimburse the United States for attorneys' fees, experts' fees, and other costs incurred in connection with that effort to enforce the Final Judgment, including the investigation of the potential violation.

Paragraph XVII.D states that the United States may file an action against a Defendant for violating the Final Judgment for up to four years after the Final Judgment has expired or been terminated. This provision is meant to address circumstances such as when evidence that a violation of the Final Judgment occurred during the term of the Final Judgment is not discovered until after the Final Judgment has expired or been terminated or when there is not sufficient time for the United States to complete an investigation of an alleged violation until after the Final Judgment has expired or been terminated. This provision, therefore, makes clear that, for four

years after the Final Judgment has expired or been terminated, the United States may still

challenge a violation that occurred during the term of the Final Judgment.

Finally, Section XVIII of the proposed Final Judgment provides that the Final Judgment

will expire ten years from the date of its entry, except that after five years from the date of its

entry, the Final Judgment may be terminated upon notice by the United States to the Court and

Defendants that the divestitures have been completed and continuation of the Final Judgment is

no longer necessary or in the public interest.

## IV.    REMEDIES AVAILABLE TO POTENTIAL PRIVATE PLAINTIFFS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been

injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to

recover three times the damages the person has suffered, as well as costs and reasonable

attorneys' fees. Entry of the proposed Final Judgment neither impairs nor assists the bringing of

any private antitrust damages action. Under the provisions of Section 5(a) of the Clayton Act, 15

U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private

lawsuit that may be brought against Defendants.

## V.    PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED
##         FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may

be entered by the Court after compliance with the provisions of the APPA, provided that the

United States has not withdrawn its consent. The APPA conditions entry upon the Court's

determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the

proposed Final Judgment within which any person may submit to the United States written

comments regarding the proposed Final Judgment. Any person who wishes to comment should

do so within 60 days of the date of publication of this Competitive Impact Statement in the Federal Register, or within 60 days of the first date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the U.S. Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time before the Court's entry of the Final Judgment. The comments and the response of the United States will be filed with the Court. In addition, the comments and the United States' responses will be published in the *Federal Register* unless the Court agrees that the United States instead may publish them on the U.S. Department of Justice, Antitrust Division's internet website.

Written comments should be submitted in English to:

> Jill C. Maguire
> Acting Chief, Healthcare & Consumer Products Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth St. NW, Suite 4100
> Washington, DC 20530
> ATR.Public-Comments-Tunney-Act-MB@usdoj.gov

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.    ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

As an alternative to the proposed Final Judgment, the United States considered continuing its litigation, including its request for a permanent injunction against UnitedHealth's acquisition of Amedisys and additional monetary penalties against Amedisys, through a full trial on the merits. Under the circumstances present here, however, the United States concludes that

entry of the proposed Final Judgment is in the public interest insofar as it avoids the time,

expense, and uncertainty of a full trial on the merits.

## VII.    STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

Under the Clayton Act and APPA, proposed Final Judgments, or "consent decrees," in

antitrust cases brought by the United States are subject to a 60-day comment period, after which

the Court shall determine whether entry of the proposed Final Judgment "is in the public

interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the

statute as amended in 2004, is required to consider:

> (A)    the competitive impact of such judgment, including termination of alleged
> violations, provisions for enforcement and modification, duration of relief sought,
> anticipated effects of alternative remedies actually considered, whether its terms
> are ambiguous, and any other competitive considerations bearing upon the
> adequacy of such judgment that the court deems necessary to a determination of
> whether the consent judgment is in the public interest; and

> (B)    the impact of entry of such judgment upon competition in the relevant
> market or markets, upon the public generally and individuals alleging specific
> injury from the violations set forth in the complaint including consideration of the
> public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is

necessarily a limited one as the government is entitled to "broad discretion to settle with the

defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d

1448, 1461 (D.C. Cir. 1995); *United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75

(D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements);

*United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C.

Aug. 11, 2009) (noting that a court's review of a proposed Final Judgment is limited and only

inquires "into whether the government's determination that the proposed remedies will cure the

antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to

enforce the final judgment are clear and manageable"); *United States v. Charleston Area Med. Ctr., Inc.*, No. 2:16-3664, 2016 U.S. Dist. LEXIS 145963 at *5–6 (S.D.W.V. Oct. 21, 2016) ("In evaluating whether the proposed final judgment is in the public interest, the inquiry is 'a narrow one.'" (quoting *Massachusetts v. Microsoft Corp.*, 372 F.3d 1199, 1236 (D.C. Cir. 2004))).

As the U.S. Court of Appeals for the District of Columbia Circuit has held, under the APPA, a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. *See Microsoft*, 56 F.3d at 1458–62. With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may not "make de novo determination of facts and issues." *United States v. W. Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993) (quotation marks omitted); *see also Microsoft*, 56 F.3d at 1460–62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 16 (D.D.C. 2000); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of competing social and political interests affected by a proposed antitrust decree must be left, in the first instance, to the discretion of the Attorney General." *W. Elec. Co.*, 993 F.2d at 1577 (quotation marks omitted). "The court should also bear in mind the *flexibility* of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is the one that will *best* serve society, but only to confirm that the resulting settlement is within the *reaches* of the public interest." *Microsoft*, 56 F.3d at 1460 (quotation marks omitted); *see also United States v. Deutsche Telekom AG*, No. 19-2232 (TJK), 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020). More demanding requirements would "have enormous practical consequences for the government's ability to negotiate future settlements," contrary to

congressional intent. *Microsoft*, 56 F.3d at 1456. "The Tunney Act was not intended to create a disincentive to the use of the consent decree." *Id.*

The United States' predictions about the efficacy of the remedy are to be afforded deference by the Court. *See, e.g.*, *Microsoft*, 56 F.3d at 1461 (recognizing courts should give "due respect to the Justice Department's . . . view of the nature of its case"); *United States v. Iron Mountain, Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) ("In evaluating objections to settlement agreements under the Tunney Act, a court must be mindful that [t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." (internal citations omitted)); *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case."). The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft*, 56 F.3d at 1461 (*quoting W. Elec. Co.*, 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*,

2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459–60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using judgments proposed by the United States in antitrust enforcement, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." Pub. L. No. 108-237, § 221, 118 Stat. 668–69 (codified as amended at 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "The court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the competitive impact statement and response to public comments alone." *U.S. Airways*, 38 F. Supp. 3d at 76 (citing *Enova Corp.*, 107 F. Supp. 2d at 17).

## VIII.  DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.


Dated: August 8, 2025

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA:


/s/  Erin K. Murdock-Park
Erin K. Murdock-Park
United States Department of Justice
Senior Litigation Counsel
Antitrust Division
450 Fifth St. NW
Washington, DC 20530
Telephone: (202) 445-8082
Email: erin.murdock-park@usdoj.gov